Media Network, Inc. v. Mullen Adver., Inc., 2007 NCBC 1

| | |
|---|---|
| NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| MECKLENBURG COUNTY | 05 CVS 7255 |

MEDIA NETWORK, INC. d/b/a
GATEWAY MEDIA,

                    Plaintiff,

       v.

MULLEN ADVERTISING, INC.;
TRANSIT ADS INCORPORATED d/b/a
CARTELES; CARL HAYNES,
individually and d/b/a HIGH PLAINS
BUSINESS CONSULTING a/k/a HIGH
PLAINS BUSINESS a/k/a HIGH
PLAINS; and HIGH PLAINS BUSINESS
CONSULTING a/k/a HIGH PLAINS
BUSINESS a/k/a HIGH PLAINS,

                    Defendants.

| | |
|---|---|
| NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| MECKLENBURG COUNTY | 05 CVS 15428 |

MEDIA NETWORK, INC. d/b/a
GATEWAY MEDIA,

                    Plaintiff,

       v.

LONG HAYMES CARR, INC. d/b/a
MULLEN/LHC and CARNEY MEDIA,
INC.,

                    Defendants.

**ORDER**

*Nexsen Pruet Adams Kleemeier, P.L.L.C. by J. Alexander S. Barrett and Stuart C. Gauffreau for Plaintiff Media Network, Inc. d/b/a/ Gateway Media.*

*Kilpatrick Stockton L.L.P. by George L. Little, Jr., W. Mark Conger and Elliot A. Fus for Defendants Mullen Advertising, Inc. and Long Haymes Carr. Inc. d/b/a Mullen/LHC.*

Diaz, Judge.

{1}     The Court heard this matter on 16 May and 8 August 2006 on the following Motions:

(a)     Plaintiff's Motion for Summary Judgment against Defendant Mullen[1] for Breach of Contract and Unfair or Deceptive Trade Practices;

(b)     Mullen's Motion for Summary Judgment;

(c)     Mullen's Motion for Partial Summary Judgment and Other Relief Regarding Damages for "Diminution in Business Value;"

(d)     Plaintiff's Motion for Leave to Submit Additional Materials in Opposition to Defendants' Motions for Partial Summary Judgment and Other Relief Regarding Damages for "Diminution in Business Value;" and

(e)     Plaintiff's Motion for Summary Judgment Regarding Proposed but Unasserted Defense.

{2}     For the reasons set forth below, and after considering the Court file, the written Motions and exhibits, and counsels' memoranda and oral arguments, the Court concludes that the proper party Defendant in these actions is Defendant Long Haymes Carr, Inc. d/b/a/ Mullen/LHC and will dismiss, *with prejudice*, Plaintiff's claims in 05 CVS 7255.

{3}     With respect to Plaintiff's claims in 05 CVS 15428, the Court:

---

[1] When the parties use the name "Mullen" in their motion papers, they are referring collectively to Defendants Long Haymes Carr, Inc. and Mullen Advertising, Inc. In this Order, the Court refers to these two defendants collectively as the "Mullen Defendants."

(a) **DENIES** Plaintiff's Motion for Summary Judgment as to its claim for breach of contract;

(b) **GRANTS** Mullen's Motion for Summary Judgment as to Plaintiff's claim for breach of contract;

(c) **DENIES** the parties' cross-motions for summary judgment as to Plaintiff's claim under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA");

(d) **GRANTS** Mullen's Motion for Partial Summary Judgment and Other Relief Regarding Damages for "Diminution in Business Value" and also **GRANTS** Mullen's separate motion to exclude any expert testimony as to this issue;

(e) **DENIES** Plaintiff's Motion for Leave to Submit Additional Materials in Opposition to Defendants' Motion for Partial Summary Judgment and Other Relief Regarding Damages for "Diminution in Business Value;" and

(f) **DENIES** Plaintiff's Motion for Summary Judgment Regarding Proposed but Unasserted Defense.

## I.

## PROCEDURAL BACKGROUND

{4}   Plaintiff Media Network, Inc. d/b/a Gateway Media ("Gateway") filed the Complaint in 05 CVS 7255 on 15 April 2005 and the Complaint in 05 CVS 15428 on 23 August 2005.[2]

{5}   Defendant Mullen Advertising, Inc. ("Mullen Advertising") answered the Complaint in 05 CVS 7255 on 13 June 2005.  Mullen Advertising served an Amended Answer on 15 June 2005.

---

[2] Among the many disputes between the parties in these cases is a disagreement as to the proper Mullen entity that should be before the Court, which, in turn, resulted in Gateway filing two Complaints asserting essentially the same claims.  Hereinafter, the Court will identify the pleadings as  "Compl. 7255" and "Compl. 15428."  If the pleadings are referred to collectively, the Court will identify them as "Compls."

{6}  Defendant Long Haymes Carr, Inc. d/b/a/ Mullen LHC answered the Complaint in 05 CVS 15428 on 31 October 2005.

{7}  The cases were transferred to the North Carolina Business Court and assigned to me as complex business matters by order of the Chief Justice of the North Carolina Supreme Court dated 3 February 2006.

{8}  The Complaints originally asserted claims against the Mullen Defendants for: (a) breach of contract, (b) misappropriation of trade secrets, (c) injunctive relief, (d) fraud, (e) negligent misrepresentation, (f) tortious interference with contract, (g) trespass to chattels, (h) unfair and deceptive trade practices, and (i) negligent supervision.  (Compl. 7255 ¶¶ 41-121; Compl. 15428 ¶¶ 42-101.)

{9}  Subsequently, the parties stipulated to the entry of certain injunctive relief that resolved all claims except for those alleging breach of contract and unfair and deceptive trade practices. (Consent Order and Inj. ¶¶ 1, 3, June 28, 2006.)

{10}  On 16 February 2006, Mullen Advertising filed a motion and supporting brief seeking partial summary judgment and other relief regarding damages for "diminution in business value."  On 7 April 2006, Gateway filed its brief in opposition.  On 18 April 2006, the Mullen Defendants filed a reply brief as to this motion.

{11}  On 31 May 2006, Gateway filed a motion and supporting brief seeking summary judgment on its claims for breach of contract and unfair and deceptive trade practices, and a separate motion and supporting brief seeking summary judgment as to a "proposed but unasserted defense."  That same day, the Mullen Defendants filed a cross-motion and supporting brief seeking summary judgment as to all claims.

4

{12}  On 23 June 2006, all parties filed opposition briefs to the motions for summary judgment. The parties then filed reply briefs on 14 July 2006.

{13}  Finally, on 18 August 2006, Gateway filed a Motion for Leave to Submit Additional Materials in Opposition to the Mullen Defendants' pending Motion for Partial Summary Judgment and Other Relief Regarding Damages for "Diminution in Business Value."  The Mullen Defendants filed a brief in opposition on 11 September 2006, and Gateway filed its reply on 21 September 2006.[3]

{14}  The Court heard the parties' oral arguments on the various motions on 16 May and 8 August 2006.

## II.

## THE FACTS

## A.

## THE PARTIES

{15}  Gateway is a Delaware corporation authorized to do business in North Carolina. (Compls. ¶ 1.)

{16}  Mullen Advertising is a Massachusetts corporation authorized to do business in North Carolina.  (Compl. 7255 ¶ 2.)

{17}  Long Haymes Carr, Inc. is a North Carolina corporation, with its principal place of business in Winston Salem, North Carolina.  (Compl. 15428 ¶ 2; Paul Slack Aff. ¶ 3.)

---

[3] Rule 15.8 of the General Rules of Practice and Procedure for the North Carolina Business Court emphasizes that "[t]he Court favors concise briefs."  BCR 15.8.  The briefing on the pending motions has been anything but concise, as the parties have deluged the Court with 13 briefs, totaling 245 pages, and seven binders of deposition testimony and supporting exhibits.  Several witnesses also felt compelled to file multiple affidavits in addition to their deposition testimony; one witness, Brad Heard, filed three affidavits.  The Court accepts some blame for this avalanche of paper because it allowed the parties to slice up the summary judgment pie by filing motions on discrete sub-issues.  Unfortunately, the Court's reward for its largesse has been briefing (and oral argument) that, while helpful, has given true meaning to the law of diminishing marginal returns and delayed entry of the Court's ruling.  I take this opportunity to gently remind the bar that less is almost always best when it comes to the practice of law, and motions practice is no exception.

{18}    Mullen Advertising and Long Haymes Carr, Inc. are subsidiaries of The Interpublic Group ("IPG"), a New York corporation.  (Slack Aff. ¶ 2.)

{19}    Since on or about 2001, Long Haymes Carr, Inc. has done business in North Carolina under the assumed name of Mullen/LHC.  (Slack Aff. ¶ 5.)  In or around 2004, Long Haymes Carr, Inc., filed documents in North Carolina to transact business as "Mullen."  (Slack. Aff. ¶ 6.)  The Court hereinafter refers to Defendant Long Haymes Carr, Inc. as "Mullen/LHC."

{20}    Carl Haynes ("Haynes") is a citizen and resident of North Carolina.  (Compl. 7255 ¶ 5.)  Gateway alleges that, during all times relevant to these actions, Haynes was doing business as High Plains Business Consulting a/k/a High Plains Business a/k/a High Plains.[4]  (Compl. 7255 ¶ 5).  At all times relevant to this action, Haynes also worked for Mullen/LHC as a Senior Vice President.  (Haynes Aff. ¶ 2, June 12, 2006.)

{21}    Haynes and Defendants Transit Ads Incorporated d/b/a Carteles, High Plains Business Consulting, and Carney Media, Inc., have all been dismissed from these actions.

**B.**

**THE CLAIMS**

{22}    In addressing the competing motions for summary judgment, the Court has accepted the non-moving party's version of the facts, where supported in the record.

{23}    In these cases, Gateway alleges that one or both of the Mullen Defendants breached a "non-cancelable" contract in which Gateway was to provide services to the Mullen Defendants in connection with an advertising program for R.J. Reynolds Tobacco Company ("RJRT").  The Mullen Defendants assert that the contract was cancelable on 60-days written notice and that a 2 February 2005 letter from the Defendants to Gateway properly provided for termination effective 4 April 2005.

---

[4] Gateway also named High Plains Business Consulting as a separate defendant in 05 CVS 7255.

{24} The alleged contract between the parties centers around a cigarette advertising program funded by RJRT in which "one-sheets" (described as poster-sized print advertisements) are designed and manufactured by an advertising agency for placement on a rotating basis in or outside convenience stores throughout the United States (hereinafter the "One-Sheet Program"). (Compl. 7255 ¶ 6-7; Compl. 15428 ¶ 7-8; Dep. Ex. 193; Williard Dep. 13:15-19.)

{25} Defendants admit that RJRT hired Mullen/LHC to develop and manage the One-Sheet Program. (Defs.' Br. in Supp. of Mot. for Summ. J. 27, May 31, 2006; Williard Dep. 21:16-22:10; Dep. Ex. 41.) They deny that Mullen Advertising is liable for the claims at issue.

{26} According to Gateway's president, however, there were many occasions where those with whom he dealt with at Mullen/LHC (including, apparently, the switchboard operator) indicated that they worked for "Mullen Advertising" or "Mullen Advertising, Inc." (Brad Heard Aff. ¶¶ 45-46, June 19, 2006.)

{27} Mullen/LHC has managed the One-Sheet Program for over 12 years. (Sterling Dep. 18:16-24; Williard Dep. 17:5-11.) In its role as manager, Mullen/LHC selected the "one-sheet" vendors, who then "posted" the advertising materials in specified geographic locations. (Dep. Ex. 29.)

{28} As a Senior Vice-President for Mullen/LHC, Haynes's duties included the administration of the One-Sheet Program. (Haynes Aff. ¶ 2, May 26, 2006; Slack Dep. 65:14-22.)

{29} From approximately 1999 through 2002, non-party Gateway Outdoor Advertising, Inc. served as a vendor for the One-Sheet Program. (Brad Heard Aff. ¶ 4, May 30, 2006; Craig Heard Dep. 44:17-45:16.)

{30} In 2002, Gateway was spun-off from Gateway Outdoor Advertising, Inc. and took over as one of four vendors for the One-Sheet Program. (Craig Heard Aff. ¶¶ 1, 4-5, Apr. 5, 2006; Brad

Heard Dep. 22:11-14.) At the request of its lender, Gateway Outdoor Advertising, Inc. formed this separate entity to facilitate loans for the funding of capital investments in the One-Sheet Program. (Craig Heard. Aff. I ¶ 5.)[5]

{31} From 2002 through its termination by Mullen/LHC in 2005, Gateway's primary (if not exclusive) source of revenue was as a vendor for the One-Sheet Program. (Compl. 7255 ¶ 22; Compl. 15428 ¶ 23; Whitt Aff. Ex. A; Brad Heard Aff. ¶ 14, Apr. 5, 2006; Craig Heard Dep. 153:22-154:5.)[6]

{32} As a condition of obtaining the vendor contract for the One-Sheet Program, and allegedly unbeknownst to Mullen/LHC and RJRT, Haynes solicited and received over $750,000.00 in "consulting fees" from Gateway and its predecessor Gateway Outdoor Advertising, Inc. (Compl. 7255 ¶¶ 10-13; Compl. 15428 ¶¶ 11-14.)[7]

{33} For its services as manager of the One-Sheet Program, Mullen/LHC received a per-sheet monthly fee of $85.00. (Compl. 7255 ¶ 17; Compl. 15428 ¶ 18.) Mullen/LHC paid Gateway 85% of the fee (or $72.25 per sheet) for its work in implementing the program. (Compl. 7255 ¶¶ 16-17; Compl. 15428 ¶¶ 17-18.)

---

[5] The other vendors were Defendants Carteles and Carney, and non-party Interstate Outdoor Advertising, L.P. (Dep. Exs. 193-94.)

[6] The one-sheet vendors were discouraged, if not expressly prohibited, from soliciting anti-tobacco or other competitive business. (Sterling Dep. 178:10-182:7, 199:14-200:1.)

[7] Mullen/LHC characterizes the payments as commercial bribes, while Gateway insists that the payments were legitimate fees for actual consulting services rendered by Haynes. While it appears that Mullen/LHC's characterization may be more accurate, the Court declines to resolve this issue here. I include the background facts merely because they provide the context for Mullen/LHC's subsequent actions. And to be fair to Haynes, the record in this case is replete with instances of other Mullen/LHC employees falling over themselves to scoop up "freebies" from one-sheet vendors and others soliciting Mullen/LHC's advertising business, some of which violate the spirit, if not the letter, of Mullen/LHC's policy regarding acceptance of such items. For example, Mullen/LHC employees routinely solicited or accepted tickets to various high-profile professional sporting and entertainment events, including, in the case of one Mullen/LHC senior executive, $4,000.00 in tickets to the 2004 American League baseball playoffs and World Series, and airfare, accommodations, meals, and venue tickets for the 2004 Summer Olympic Games in Athens, Greece. (Dep. Exs. 5-8; Trosan Dep. 101:4-22, 133:12-22, 136:10-137:14, 182:19-186:20.)

{34} Gateway implemented the One-Sheet Program upon receipt of so-called "insertion orders." (Sterling Aff. Exs. A, B.) The insertion orders are form documents that provided Gateway with specific details regarding implementation of the One-Sheet Program in monthly intervals over the course of the contract year, including the convenience store locations to be served, the number of "one-sheet" advertisements to be posted, the "issue" months for the particular postings, and the total fee that Gateway would be paid for that order. (Sterling Aff. Exs. A, B.)

{35} The "terms and conditions" portion of the insertion orders also provided that (a) Mullen/LHC could "cancel this contract, with no obligation of payment or penalty . . . upon written notice to the [vendor] at least sixty (60) days, including Sundays and holidays, in advance of any scheduled posting date;" and (b) the "contract contains the entire understanding between the parties and cannot be changed or terminated orally." (Sterling Aff. Ex. A.)

{36} In 2002 and 2003, the parties performed the One-Sheet Program under contracts that allowed Mullen/LHC to cancel any uncompleted one-sheet postings pursuant to the 60-day notice provision. (Compl. 7255 ¶ 17; Compl. 15428 ¶ 18.)

{37} In 2004, however, Mullen/LHC and RJRT negotiated a reduced gross monthly fee of $74.00 per sheet, which, in turn, resulted in a $62.90 per sheet fee to the vendors. (Compl. 7255 ¶ 18; Compl. 15428 ¶ 19.) To induce the vendors to accept the reduced rate, Mullen/LHC (with RJRT's consent) agreed that the vendor contracts for 2004 would be guaranteed for one year. (Compl. 7255 ¶ 18; Compl. 15428 ¶ 19.) Accordingly, without striking the form language regarding termination in the "terms and condition" portion of the insertion orders, the parties added the following to the front page of the insertion orders for 2004:

> CONTRACTS ARE NON-CANCELABLE PER AGREEMENT WITH RJRT
> TO RECEIVE REDUCED SPACE RATE OF $74 GROSS PER UNIT PER

MONTH, FOR TRADITIONAL ONE-SHEETS . . . CONTRACTS WILL
RUN THE TERM INDICATED.

(Sterling Aff. Ex. A.)[8]

{38}    The parties performed the One-Sheet Program without incident in 2004.  (Brad Heard

Aff. ¶ 14, May 30, 2006.)

{39}    On or about 5 October 2004, Haynes wrote to Gateway and the other vendors to

announce a further reduction in the per-sheet fee for 2005 (hereinafter the "Haynes

Memorandum").  Specifically, Haynes told the vendors:

> As we move forward toward issuance of RJRT one-sheet contracts for 2005
> we will be reducing the unit rate to $71 gross.
>
>     . . . .
>
> The $71 is predicated upon continuous contracts (non-cancelable) and
> significant volume to make the acceptance of our contracts worth your while.
>
>     . . . .
>
> As always, acceptance of the new pricing is your decision.  If you choose not
> to do so please let me know so we can plan accordingly.

(Compls. Ex. 3.)  The Haynes Memorandum also explained that "our contracts specify the

market in which we are placing one-sheets."  (Compls. Ex. 3.)

{40}    In response, Gateway's president, Brad Heard, wrote Haynes via e-mail that, "We are

certainly on board at the new rate.  We appreciate the business you have given us and look

forward to 2005."  (Brad Heard Aff. ¶ 18, May 30, 2006; Dep. Ex. 178.)

{41}    Sometime in November 2004, Mullen/LHC sent Gateway the insertion orders for 2005,

which denoted the new $71.00 per-sheet gross fee.  (Brad Heard Aff. ¶¶ 22-23, May 30, 2006;

Brad Heard Aff. ¶¶ 38, 44, June 19, 2006.)  Unlike the 2004 insertion orders, however, the 2005

---

[8] The "terms and conditions" portion of the insertion orders resolved the inconsistency in the contract language by noting that "[w]hen there is any inconsistency between these standard conditions and a provision on the face hereof, the latter shall govern."  (Sterling Aff. Ex. A.)

orders did not state expressly that they were non-cancelable. (Brad Heard Aff. ¶¶ 22-23, May 30, 2006; Brad Heard Aff. ¶¶ 38, 44, June 19, 2006.) Rather, the documents contained the form language used in earlier contract years allowing Mullen/LHC to cancel on 60-days notice. (Brad Heard Aff. ¶¶ 22-23, May 30, 2006; Brad Heard Aff. ¶¶ 38, 44, June 19, 2006.)

{42} When Brad Heard received the 2005 insertion orders in early November 2004, he noticed the omission and called Haynes, who assured him that this was an inadvertent error and that the reduced rate was based on a guaranteed one-year term. (Brad Heard Aff. ¶ 38, June 19, 2006; Brad Heard Dep. 156:9-158:6, 160:5-17.)

{43} In a series of e-mails in or around early February 2005, Haynes insisted that he had previously confirmed the guaranteed term with his superior Carol Sterling. (Haynes Aff. Exs. A-B, June 12, 2006.) Mullen/LHC disputes this claim, insisting that Haynes had no authority to make such a commitment because Mullen/LHC had not yet received approval from its client RJRT. (Sterling Aff. ¶¶ 8-9; Slack Dep. 257:12-15; Troutman Dep. 207:7-25, 218:20-219:6.) Haynes has since retracted his earlier e-mails, stating that although he "expected that the vendors' 2005 contracts would be 'non-cancelable' . . . [Gateway knew that he] did not have authority to provide contracts until all terms had been approved by [RJRT]." (Haynes Aff. ¶ 7, May 26, 2006.)

{44} Regardless, on 8 December 2004, JoAn Williard, who served as Media Director for RJRT, notified Sterling of RJRT's preliminary approval of one-year guaranteed contracts for the 2005 One-Sheet Program. (Dep. Ex. 21.) A few days later, Williard received final approval for this commitment, which she then communicated to Sterling by telephone. (Williard Dep. 337:13-25.) Sterling claims to have no recollection of this conversation, however, and there is no evidence that Gateway was told of RJRT's action.

11

{45} Instead, following Heard's conversation with Haynes in early November 2004, Heard signed one or more of the 2005 insertion orders (containing the 60-day cancellation term), and Gateway subsequently began performing in late December 2004 by, among other things, borrowing funds to implement the 2005 One-Sheet Program, purchasing equipment and other necessary supplies, leasing space from convenience store operators, and convening operational meetings with its management, employees, and subcontractors. (Compl. 7255 ¶ 25; Compl. 15428 ¶ 26; Brad Heard Aff. ¶¶ 51-55, June 19, 2006; Brad Heard Dep. 160:18-22.)[9]

{46} In March 2004, IPG retained an outside accounting firm to investigate the "consulting fees" paid by Gateway to Haynes. (Slack Dep. 27:18-28:12, 59:6-13; Battson Dep. 16:15-20.) The nearly year-long investigation confirmed that the payments had been made, and Mullen/LHC concluded that they violated the company's internal ethics rules. (Battson Dep. 20:18-24; Dep. Exs. 118, 340.)[10] As a result, Mullen/LHC suspended Haynes in December 2004, and then fired him in January 2005. (Haynes Aff. ¶ 2, May 26, 2006; Haynes Aff. ¶ 2, June 12, 2006; Ambrosio Aff. ¶¶ 3-4.)

{47} On 2 February 2005, Mullen/LHC, at RJRT's insistence, terminated Gateway as a one-sheet vendor pursuant to the 60-day termination provision in the 2005 insertion orders. (Compls. Ex. 4; Slack Dep. 236:10-20; Williard Dep. 85:23-86:22, 88:21-25.) Mullen/LHC's notice referred specifically to the investigation regarding the payments made to Haynes as a basis for the termination. (Compls. Ex. 4.)

---

[9] Sometime in early November 2004, Haynes and Sterling discussed the vendors' concerns over the lack of express language in the insertion orders guaranteeing a one-year term. (Sterling Dep. 51:25-64:25.) Sterling, however, did not tell Gateway that Mullen/LHC had not approved non-cancelable contracts for 2005 before Gateway began performing. (Sterling Dep. 67:2-8.)

[10] According to Gateway, Mullen/LHC knew of the allegedly illegal payments as early as March 2004 and certainly no later than August 2004, when it discovered documents on Haynes's computer referencing the payments. (Battson Dep. 16:15-20, 61:7-62:17, 73:8-10, 88:6-15.) Gateway also alleges that, despite this knowledge, Mullen/LHC allowed Haynes to continue negotiating contracts with the vendors for 2005. (*See* Compl. 7255 ¶ 35.)

{48}    Following its termination, Gateway was unable to obtain any other business to mitigate its damages.  (Brad Heard Aff. ¶ 20, Apr. 5, 2006; Brad Heard Dep. 206:13-19.)  The reason, according to Brad Heard, is that the advertising industry has two major buying cycles:  (a) during the Fall for the upcoming year; and (b) in the first quarter of each year for Spring or Summer promotions.  (Brad Heard Aff. ¶ 16, Apr. 5, 2006.)  According to Heard, because Mullen/LHC, knowing that the one-sheet business was Gateway's sole source of revenue, terminated Gateway in February 2005, Gateway "missed out on both major buying cycles for 2005 and had significantly reduced ability to find replacement business for 2005."  (Brad Heard Aff. ¶¶ 19, 20, Apr. 5, 2006.)  As a result, the company shut down its operation and folded its assets and obligations into Gateway Outdoor Advertising, Inc.  (Brad Heard Aff. ¶ 22, Apr. 5, 2006.)[11]

{49}    Gateway seeks to recover more than $3 million in profits allegedly lost in 2005 following its termination as a one-sheet vendor, as well as $14.472 million in damages arising from the alleged diminution in Gateway's business value.  (Whitt Aff. Ex. A ¶ 64.)

{50}    According to Gateway's damages expert, T. Randolph Whitt ("Whitt"), the approximately $14.5 million in "diminution in business value" damages is derived by "'estimating what the value of Gateway's business would have been at the end of 2005 had the Mullen/RJRT business continued . . . **or a level of business similar to the Mullen RJRT business,** compared to the actual estimated value of the business at the end of 2005 without the Mullen/RJRT business.'"  (Whitt Aff. ¶ 8 (quoting Whitt Aff. Ex. A ¶ 40) (emphasis in original).)

---

[11] In its 2 February 2005 termination notice, Mullen/LHC also raised some performance issues regarding Gateway's one-sheet postings.  (Compls. Ex. 4.)  Ultimately, however, Gateway was paid in full for its work up to and including the date of its termination.  (Troutman Dep. 233:14-25; Dep. Ex. 101.)

{51}    More specifically, Whitt arrived at this figure by projecting Gateway's expected net cash flows for the years 2006-2010 and then discounting these amounts to present value using a 22% discount rate. (Whitt Aff. Ex. A ¶¶ 46-49.)

{52}    Mullen/LHC, however, was not obligated to provide any one-sheet business to Gateway beyond 2005. (Brad Heard Dep. 225:14-20; Guldner Dep. 191:19-25.)

### III.

### CONCLUSIONS OF LAW

### A.

### SUMMARY JUDGMENT STANDARD

{53}    Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2006).

{54}    The moving party bears the burden of showing a lack of triable issues of fact. *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985). Once the moving party meets this burden, the nonmoving party must "produce a forecast of evidence demonstrating that the [nonmoving party] will be able to make out at least a prima facie case at trial." *Collingwood v. Gen. Elec. Real Estate Equities, Inc.*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989).

{55}    When considering a motion for summary judgment, a trial court may not resolve issues of fact and must deny the motion if there is a genuine issue as to any material fact. *Singleton v. Stewart*, 280 N.C. 460, 464, 186 S.E.2d 400, 403 (1972). "An issue is material if the facts alleged would constitute or would irrevocably establish any material element of a claim or

defense." *Anderson v. Canipe*, 69 N.C. App. 534, 536, 317 S.E.2d 44, 46 (1984). "An issue is genuine if it may be maintained by substantial evidence." *Id.*

{56} In deciding the motion, "'all inferences of fact . . . must be drawn against the movant and in favor of the party opposing the motion.'" *Caldwell v. Deese*, 288 N.C. 375, 378, 218 S.E.2d 379, 381 (1975) (quoting 6 James Wm. Moore, et al., Moore's Federal Practice § 56.15[3] (2d ed. 1971)).

{57} Finally, summary judgment is a drastic remedy that should be granted cautiously. Where the slightest doubt exists as to the merits of the motion, it should be denied. *First Fed. Sav. & Loan Ass'n v. Branch Banking & Trust Co.*, 282 N.C. 44, 51, 191 S.E.2d 683, 688 (1972); *Volkman v. DP Assocs.*, 48 N.C. App. 155, 157, 268 S.E.2d 265, 267 (1980).

## B.

## PROPER PARTY DEFENDANT

{58} Mullen Advertising argues first that the separate complaint filed against it in 05 CVS 7255, which duplicates the claims filed against Mullen/LHC in 05 CVS 15428, should be dismissed because Mullen Advertising was not the corporate entity that dealt with Gateway. (Defs.' Br. in Supp. of Mot. for Summ. J. 27-29, May 31, 2006.) I agree.

{59} Gateway sued Mullen Advertising on 15 April 2005. Approximately four months later, it filed the same claims against Mullen/LHC. Gateway asserts that it may seek relief against both Mullen Defendants based on evidence that several of the Defendants' representatives involved in the decision to terminate Gateway as a one-sheet vendor claimed to be working for "Mullen Advertising" and another representative expressed a belief that Mullen/LHC and Mullen Advertising were the same company. (Pl.'s Br. in Resp. to Def. Mullen's Mot. for Summ. J. 33; Brad Heard Aff. ¶¶ 45-46, June 19, 2006.)

15

{60} To be blunt, these are the thinnest of factual reeds on which to rest support for effectively doubling the Court's file and increasing the litigation burden for all parties. In the first place, whatever confusion Gateway may have had about the relationship of the Mullen Defendants should have been laid to rest when it reviewed the North Carolina Secretary of State filings and other records showing clearly that Mullen/LHC and Mullen Advertising are separate companies. (*See* Slack Aff. Exs. A-F.)

{61} Moreover, in its briefs and arguments to this Court, Gateway has never wavered from its insistence that a contract was formed in October 2004 between its president Brad Heard and Mullen/LHC's former senior vice-president Carl Haynes. Gateway, however, presents **no** evidence to dispute the fact that Haynes worked only for Mullen/LHC and, although Mullen/LHC disputes Haynes's authority with respect to the alleged contract, (*see* Mullen's Resp. to Pl.'s Mot. for Summ. J. for Breach of Contract and Unfair and Deceptive Trade Practices 13, June 23, 2006), it does not disavow responsibility for the actions taken by the individuals that Gateway blames for wrongfully terminating the alleged contract.

{62} Consequently, whatever Haynes (or any other individual) did with respect to the alleged contract, and whatever liability arises from those acts, is the responsibility of Mullen/LHC alone. I find absolutely **no** merit to Gateway's attempt to prosecute two separate actions here.

{63} Accordingly, the Court **GRANTS** Defendant Mullen Advertising's Motion for Summary Judgment and dismisses, *with prejudice*, the claims in 05 CVS 7255.

## C.

### BREACH OF CONTRACT

{64} Both parties argue that they are entitled to summary judgment as to Gateway's breach of contract claim. Because the specific evidence that Gateway relies on to buttress its claim is

16

deficient as a matter of law, the Court will **GRANT** Mullen/LHC's motion and dismiss this claim.

## 1.

## APPLICABLE LAW

{65}   The elements of a valid contract are offer, acceptance, consideration, and mutuality of assent to the contract's essential terms. *Cap Care Group, Inc. v. McDonald*, 149 N.C. App. 817, 822, 561 S.E.2d 578, 582 (2002) ("An enforceable agreement requires an offer, acceptance and consideration."); *Snyder v. Freeman*, 300 N.C. 204, 218, 266 S.E.2d 593, 602 (1980) ("The essence of any contract is the mutual assent of both parties to the terms of the agreement so as to establish a meeting of the minds."). "It is a well-settled principle of contract law that a valid contract exists only where there has been a meeting of the minds as to all essential terms of the agreement." *Northington v. Michelotti*, 121 N.C. App. 180, 184, 464 S.E.2d 711, 714 (1995) (citing *O'Grady v. First Union Nat'l Bank of N.C.*, 296 N.C. 212, 221, 250 S.E.2d 587, 594 (1978)); *see Boyce v. McMahan*, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974).

{66}   An agreement to make a contract, or as the cases sometimes phrase it, "an agreement to agree," does not constitute a binding obligation. *Gregory v. Perdue, Inc.*, 47 N.C. App. 655, 657, 267 S.E.2d 584, 586 (1980).   For a contract to bind two parties, they must assent to the same thing in the same sense, and their minds must meet at least with respect to **all** material terms.  Thus, a contract that leaves material terms open for future negotiations is invalid. *Id.; Boyce*, 285 N.C. at 734, 208 S.E.2d at 695.  Put another way, "[i]f any portion of the proposed terms is not settled, there is no agreement." *Goeckel v. Stokely*, 236 N.C. 604, 607, 73 S.E.2d 618, 620 (1952).

17

{67}   On the other hand, "the law . . . does not favor the destruction of contracts on account of uncertainty, and 'the courts will, if possible, so construe the contract as to carry into effect the reasonable intent of the parties, if it can be ascertained.'" *Welsh v. N. Telecom, Inc.*, 85 N.C. App. 281, 290, 354 S.E.2d 746, 751 (1987) (quoting *Fisher v. John L. Roper Lumber Co.*, 183 N.C. 486, 490, 111 S.E. 857, 860 (1922)).  Wherever possible, "courts should attempt to determine the intent of the parties from the language used, construed with reference to the circumstances surrounding the making of the contract." *Id.* (citing *Chew v. Leonard*, 228 N.C. 181, 44 S.E.2d 869 (1947)).

**2.**

**ANALYSIS**

**a.**

**LEGAL SUFFICIENCY OF THE ALLEGED CONTRACT**

{68}   I conclude that I may determine the sufficiency of the disputed contract as a matter of law and that, contrary to Gateway's claim, the October 2004 exchange of correspondence between Carl Haynes and Brad Heard did not create a contract.

{69}   In its Complaints, Gateway asserts that the Haynes Memorandum committing Mullen/LHC to a $71.00 per-sheet non-cancelable price for insertion orders commencing in 2005, and the 7 October 2004 e-mail response by Brad Heard, Gateway's president, accepting these terms created a binding contract with nothing more to be negotiated by the parties. (Compl. 7255 ¶¶ 20-22; Compl. 15428 ¶¶ 21-23.)  I disagree.

{70}   For the purposes of analyzing the sufficiency of Gateway's breach of contract claim, the Court assumes (as Gateway alleges) that Haynes was authorized to commit Mullen/LHC to the

18

terms in the Haynes Memorandum and that Gateway accepted those terms. Even so, however, these writings fall far short of a contract.

{71}    On its face, the Haynes Memorandum refers to the parties moving "toward issuance of RJRT one-sheet contracts for 2005" before indicating that any such contracts will be predicated on a reduced $71.00 per-sheet rate and a guaranteed one-year term. (Compls. Ex. 3.)

{72}    The Haynes Memorandum also makes clear, however, that any such contracts would "specify the market in which we are placing one-sheets." (Compls. Ex. 3.) Thus, while Haynes certainly presented the $71.00 rate in conjunction with an offer of a non-cancelable contract, and Gateway accepted those terms, the parties negotiated nothing else.

{73}    In North Carolina, "a contract, or offer to contract, leaving material portions open for future agreement is nugatory and void for indefiniteness [and, therefore,] 'a contract to enter into a future contract must specify all its material and essential terms, and leave none to be agreed upon as a result of future negotiations.'" *Boyce*, 285 N.C. at 733, 734, S.E.2d at 695 (quoting *Croom v. Goldsboro Lumber Co.*, 182 N.C. 217, 220, 108 S.E. 735, 737 (1921)).

{74}    A party may not enforce a purported contract that omits the "nature and extent of the service to be performed, the place where, and the person to whom it is to be rendered, and the compensation to be paid," *Croom*, 182 N.C. at 220, 108 S.E. at 737, or that fails to specify the quantity to be furnished. *Elks v. N.C. State Ins. Co.*, 159 N.C. 619, 626, 75 S.E. 808, 811 (1912); *see also Williamson v. Miller*, 231 N.C. 722, 58 S.E.2d 743 (1950) (dismissing complaint where the alleged contract for the sale of merchandise failed to provide for the sale and delivery of any specified quantity of the goods).

{75}    The alleged contract in this case required Gateway to post one-sheet cigarette advertisements in or outside convenience stores throughout the United States. (Dep. Ex. 29.)

Following their exchange of correspondence in early October 2004, the parties had reached agreement on only some of the material terms of the purported contract, that is, on a "unit" or "per-sheet" price, conditioned on a guaranteed one-year term. Even with that commitment in hand, however, Gateway could not perform in October 2004, because it had not yet reached agreement with Mullen/LHC as to, among other things, the number of one-sheets to be posted, the "issue months" for the postings, and their geographic locations.

{76} Without agreement on these materials terms, the parties' purported commitment on 7 October 2004 to a fixed unit price and a guaranteed term was meaningless because "'there would be no way by which the court could determine what sort of a contract the [future] negotiations would result in; [and] no rule by which the court could ascertain what damages, if any, might follow a refusal to enter into such future contract on the arrival of the time specified.'" *Boyce*, 285 N.C. at 734, 208 S.E.2d at 695 (quoting *Croom*, 182 N.C. at 220, 108 S.E. at 737).

{77} Mullen/LHC presented these additional material terms in the subsequent insertion orders that Gateway's president received in November 2004. Because the parties had not yet committed to a contract, however, Mullen/LHC was free to retract its earlier offer of a guaranteed one-year term, which it did by tendering its form insertion order containing the 60-day cancellation provision. Gateway's president clearly understood the significance of this omission when he called Haynes to inquire about it.

{78} For reasons I discuss later, the ensuing conversation between Heard and Haynes—wherein Haynes allegedly assured Gateway's president that this omission was inadvertent and that the parties agreement in fact included a guaranteed one-year term—provides a sufficient basis for Gateway to proceed on its claim alleging unfair and deceptive trade practices.

{79}    As to Gateway's breach of contract claim, however, there simply was no contract between the parties following Gateway's receipt of the Haynes Memorandum and its 7 October 2004 e-mail response because the offer was too indefinite to bind the parties.

**b.**

**RATIFICATION AND USE OF PAROL EVIDENCE**

{80}    Gateway also asserts that there is a genuine issue of material fact as to whether Mullen/LHC ultimately ratified a one-sheet contract for 2005 that included a one-year guaranteed term.  (Pl.'s Reply Br. In Supp. of Mot. for Summ. J. Against Def. Mullen for Breach of Contract and Unfair or Deceptive Trade Practices 13-15, June 23, 2006.)  The Court disagrees.

{81}    Gateway's first contention is that RJRT's approval of non-cancelable contracts in or around December 2004 served as a ratification of the disputed contract by Mullen/LHC.  (Pl.'s Reply Br. In Supp. of Mot. for Summ. J. Against Def. Mullen for Breach of Contract and Unfair or Deceptive Trade Practices 15, June 23, 2006.)  This argument, however, confuses both the undisputed facts regarding the relationship of the parties to this transaction and the law of ratification.

{82}    Ratification occurs when:

> [A] person with no authority whatsoever (or in excess of the limited authority given her) makes a contract as an agent for another or purports to do so.  Upon discovery of the facts, the principal may ratify the contract, in which event it will be given the same effect as if the agent or purported agent had actually been authorized by the principal to make the contract prior to the making thereof.

*Blanchard v. MBNA Am. Bank, N.A.*, 2005 U.S. Dist. LEXIS 18450, at *15 (W.D.N.C. Aug. 9, 2005) (citing *Patterson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 266 N.C. 489, 146 S.E.2d 390 (1966)).  On the other hand, "'ratification is not possible unless the person making the contract, in doing so, purported to act as the agent of the person . . . claimed to be the principal.'"

21

*Inv. Props. of Asheville, Inc. v. Allen*, 283 N.C. 277, 288, 196 S.E.2d 262, 269 (1973) (quoting

*Patterson*, 266 N.C. at 492-93, 146 S.E.2d at 393) (internal citation omitted) (ellipses in

original).

{83}    In this case, there is no dispute that Mullen/LHC was acting as agent for its disclosed

principal, RJRT, and not the other way around.[12]  Gateway's argument on ratification thus

amounts to the legal equivalent of attempting to force a square peg into a round hole.  In short,

the fact that RJRT, as principal, may have approved a non-cancelable contract with Gateway for

2005 does not establish a ratification of that same contract by Mullen, as agent.  None of the

cases that Gateway relies on extend the law of ratification so far, and this Court sees no good

reason to twist an otherwise coherent legal concept beyond all recognition.

{84}    Gateway next argues that the following "undisputed" facts establish Mullen/LHC's

ratification of a non-cancelable contract purportedly executed by Haynes:

> (1) Mullen negotiated with the one-sheet vendors, including Gateway, for a
> lower, non-cancelable rate of $71.00 for 2005; (2) Mullen issued insertion
> orders for 2005 to Gateway and the other vendors in early November 2004 at
> the $71.00 rate; (3) Immediately thereafter, Carl Haynes informed his
> supervisor at Mullen, Carol Sterling, that he (on behalf of Mullen) had
> promised the vendors that their contracts would be non-cancelable if they
> accepted the $71.00 rate, and Mullen never re-issued insertion orders for 2005
> at a higher rate; (4) Gateway and the other vendors performed in 2005 at the
> lower $71.00 rate and were paid by Mullen at the lower $71.00 rate; (5) On
> January 21, 2005, Mullen informed a prospective replacement vendor that 'the
> space rate for non-cancelable orders is $71 gross per unit per month' . . . and
> (6) Mullen received bonus and incentive compensation from RJRT in 2005 as
> a result of reducing the rate from $74.00 to the non-cancelable rate of $71.00.

(Pl.'s Br. in Resp. to Def. Mullen's Mot. for Summ. J. 14-16, June 23, 2006.)  The Court again

disagrees.

---

[12] Mullen/LHC has not moved to dismiss the breach of contract claim on this basis.  *See Baker v. Rushing*, 104 N.C. App. 240, 248, 409 S.E.2d 108, 112 (1991) (stating that "[a]n authorized agent who enters into a contract on behalf of a disclosed principal generally is not personally liable to third parties since the contract is with the principal.").

22

{85}     The first undisputed fact merely recounts the parties' negotiations in October 2004, which the Court has already determined did not result in a contract.  Ratification presumes the existence of a contract (albeit an unauthorized one), and Gateway's assertion that preliminary negotiations can amount to ratification improperly places the ratification cart before the contract horse.

{86}     The second and fourth undisputed facts say nothing about ratification and, in fact, ignore the plain language of the insertion orders allowing Mullen/LHC to cancel any uncompleted work on 60-days notice.

{87}     The fifth undisputed fact attempts to use Mullen/LHC's separate negotiations with other one-sheet vendors as a basis for ratification of Gateway's alleged contract.  The sixth undisputed fact attempts to fashion a similar connection arising from Mullen's compensation arrangement with its principal RJRT.  While I agree with Gateway that a jury "'may find ratification from any course of conduct on the part of the principal which reasonably tends to show an intention on his part to ratify the agent's unauthorized acts[,]" *Phillips v. Rest. Mgmt. of Carolina, L.P.*, 146 N.C. App. 203, 210, 552 S.E.2d 686, 691 (2001) (quoting *Brown v. Burlington Indus., Inc.*, 93 N.C. App. 431, 437, 378 S.E.2d 232, 236 (1989)), I find as a matter of law that Mullen/LHC's alleged conduct involving **other** contracts and parties does not reasonably allow for such a conclusion here.

{88}     Finally, the third "undisputed" fact amounts to a claim that a jury should be allowed to consider parol evidence of the parties' true agreement regarding the 2005 One-Sheet Program.

{89}     Generally, "[t]he parol evidence rule excludes prior or contemporaneous oral agreements which are inconsistent with a written contract if the written contract contains the complete agreement of the parties."  *Tar River Cable TV, Inc. v. Standard Theatre Supply Co.*, 62 N.C.

App. 61, 64-65, 302 S.E.2d 458, 460 (1983). The parol evidence rule, however, does not bar the admission of such evidence "to prove that a written contract was procured by fraud because 'the allegations of fraud challenge the validity of the contract itself, not the accuracy of its terms[.]'" *Godfrey v. Res-Care, Inc.*, 165 N.C. App. 68, 598 S.E.2d 396, 403 (2004) (quoting *Fox v. S. Appliances, Inc.*, 264 N.C. 267, 270, 141 S.E.2d 522, 525 (1965)) (alteration in original).

{90}    In response to Gateway's contention, Mullen/LHC asserts that the written insertion orders bar any claim that the agreement was non-cancelable for one year because they provide expressly for cancellation on 60-days notice and contain an integration or "merger" clause affirming that the documents are a complete statement of the contract terms. (Mullen's Resp. to Pl.'s Mot. for Summ. J. for Breach of Contract and Unfair or Deceptive Trade Practices 7-10, June 23, 2006.)

{91}    "North Carolina recognizes that merger clauses are valid contractual provisions and the courts consistently uphold their use." *Mech. Sys. & Servs., Inc. v. Carolina Air Solutions, L.L.C.*, 2003 NCBC 9, at ¶ 25 (N.C. Super. Dec. 3, 2003) (citing *Zinn v. Walker*, 87 N.C. App. 325, 333, 361 S.E.2d 314, 318 (1987)).

{92}    The primary purpose of a merger clause is "to effectuate the policies of the Parol Evidence Rule; i.e., barring the admission of prior and contemporaneous negotiations on terms inconsistent with the terms of the writing." *Zinn*, 87 N.C. App. at 333, 361 S.E.2d at 318.

{93}    As Gateway notes, however, "[w]here giving effect to the merger clause would frustrate and distort the parties' true intentions and understanding regarding the contract, the clause will not be enforced." *Id.* For this exception to apply, however, "the parties' conduct [must indicate] their intentions to include collateral agreements or writings despite the existence of the merger clause and the parol evidence [must not be] **markedly different,** if at all, from the written contract . . . ." *Id.* at 334, 361 S.E.2d at 319 (emphasis added).

24

{94}    The *Zinn* holding does not aid Gateway here.  Taking the evidence in the light most favorable to Gateway, Haynes's promise of a guaranteed one-year term is completely at odds with the express terms of the written insertion orders allowing Mullen/LHC to cancel any uncompleted one-sheet postings on 60-days notice.  Accordingly, the parol evidence rule bars Gateway's attempt to vary the terms of the paper writing.

{95}    Finally, as the Court more fully explains in its discussion of Gateway's UDTPA claim, Gateway's complaint smacks of fraud in the inducement, which is a recognized exception to the parol evidence rule.  However, "'an action for fraud inducing the execution of a contract is not on the contract but in tort . . . .'"  *Parker v. Bennett*, 32 N.C. App. 46, 50, 231 S.E.2d 10, 13, (1977) (internal citation omitted).  Alternatively, fraud in the inducement can be asserted to rescind a contract or as a defense to a breach of contract claim, in which case the contract would be rendered void.  *Fox*, 264 N.C. at 270, 141 S.E.2d at 525; *see also Godfrey*, 165 N.C. App. at 78, 598 S.E.2d at 403.

{96}    In this case, Gateway has dismissed its fraud claim against Mullen and Haynes, leaving only its UDTPA claim, and Gateway clearly does not seek avoidance of the written insertion orders, but rather wants to admit evidence of oral statements, consistent with its view of the "true" agreement.  Because, however, this evidence would substitute a new and different agreement from the one memorialized by the parties in writing, it is barred by the parol evidence rule.  *See Neal v. Marrone*, 239 N.C. 73, 78, 79 S.E.2d 239, 242 (1953).

{97}    Accordingly, for the reasons set forth above, the Court **GRANTS** Mullen/LHC's motion for summary judgment as to Gateway's breach of contract claim.

**D.**

**UNFAIR AND DECEPTIVE TRADE PRACTICES**

{98}   Both parties have moved for summary judgment as to Gateway's UDTPA claim. Because I conclude that there are genuine issues of material fact as to this claim, the Court will **DENY** the cross-motions.

**1.**

**APPLICABLE LAW**

{99}   The elements of a UDTPA claim are "(1) defendant[] committed an unfair or deceptive act or practice, (2) in or affecting commerce and (3) plaintiff was injured as a result." *Phelps-Dickson Builders, L.L.C. v. Amerimann Partners*, 172 N.C. App. 427, 439, 617 S.E.2d 664, 671 (2005).

{100}   "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious[.]" *Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981).

{101}   As for the element of deception, "a plaintiff need not show fraud, bad faith, or actual deception. Instead, it is sufficient if a plaintiff shows that a defendant's acts possessed the tendency or capacity to mislead or created the likelihood of deception." *RD&J Props. v. Lauralea-Dilton Enters.*, *LLC,* 165 N.C. App. 737, 748, 600 S.E.2d 492, 501-02 (2004). "In a business context, this question is determined based on the likely effect on 'the average businessperson.'" *Id.*, 600 S.E.2d at 502 (quoting *Bolton Corp. v. T. A. Loving Co.*, 94 N.C. App. 392, 412, 380 S.E.2d 796, 808 (1989)).

{102}   Although it is a question of fact whether the defendant performed the alleged acts, it is a question of law whether those facts constitute an unfair or deceptive trade practice. *First Atl. Mgmt., Corp. v. Dunlea Realty, Co.,* 131 N.C. App. 242, 252-53, 507 S.E.2d 56, 63 (1998).

{103} "It is well established[, however,] that a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action [under the statute]." *Computer Decisions, Inc. v. Rouse Office Mgmt. of N.C., Inc.*, 124 N.C. App. 383, 390, 477 S.E.2d 262, 266 (1996). To sustain a cause of action, a plaintiff is required to allege and prove that "substantial aggravating circumstances" attended the breach. *Id.*

{104} Finally, when a UDTPA claim is based on alleged misrepresentations, the plaintiff must show that the misrepresentations complained of proximately caused it actual injury. *See Mosley & Mosley Builders, Inc. v. Landin Ltd.*, 97 N.C. App. 511, 517, 389 S.E.2d 576, 579 (1990); *Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 535 (4th Cir. 1989). As to this issue, however, "whether plaintiffs' damages were the proximate result of defendants' actions is almost always a question of fact for the jury." *Edwards v. West*, 128 N.C. App. 570, 575, 495 S.E.2d 920, 924 (1998).

## 2.

## ANALYSIS

{105} Gateway catalogues a virtual "potpourri" of alleged misconduct by Mullen/LHC that it argues is sufficient to support its UDTPA claim. (*see* Br. in Supp. of Pl.'s Mot. for Summ. J. Against Def. Mullen for Breach of Contract and Unfair and Deceptive Trade Practices 25-27; Pl.'s Br. in Resp. to Def. Mullen's Mot. for Summ. J. 28-29.) For purposes of resolving the competing motions, however, the Court focuses on only one of these claims.

{106} According to Plaintiff's evidence, in or around 7 October 2004, Haynes promised Gateway's President that the 2005 one-sheet contract would be guaranteed for one year at a reduced rate of $71.00 per-sheet. (Compls. Ex. 3.) Haynes then later repeated that promise and commitment when Heard called to discuss its omission from the 2005 insertion orders, (Brad

Heard Aff. ¶ 38, June 19, 2006; Brad Heard Dep. 156:9-158:6, 160:5-17), and although Gateway apparently did not know it at the time, Mullen/LHC's principal later gave Mullen/LHC authority to execute a guaranteed contract, (Williard Dep. 337:13-25.) Finally, neither Haynes nor his superior made any effort to disavow Haynes's promise of a guaranteed one-year term. (Sterling Dep. 51:25-64:25, 67:2-8.)

{107} Mullen/LHC's evidence is that Haynes never made an unqualified commitment of a guaranteed term and that, in any event, Haynes knew he was not authorized to make such an offer when he did because RJRT had not given its approval. (Sterling Aff. ¶¶ 8-9; Slack. Dep. 257:12-15; Troutman Dep. 207:7-25, 218:20-219:6.)

{108} Gateway responds that Haynes either had such authority or falsely represented his bona fides when he committed Mullen/LHC to the one-year term and that Mullen/LHC did nothing to correct this misrepresentation. (Pl.'s Br. in Resp. to Def. Mullen's Mot. for Summ. J. 11-15, June 23, 2006.)

{109} This factual dispute is both material and genuine. It is genuine because there is substantial evidence on either side of the issue. It is material because if, as Mullen/LHC asserts, Haynes lacked authority to commit to a guaranteed one-year term, and if, as Gateway insists, Haynes made the promise anyway, then Gateway's claim smacks of fraud in the inducement.

{110} "The essential elements of fraud [or, in this case, fraud in the inducement] are: '(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.'" *Rowan County Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 17, 418 S.E.2d 648, 658 (1992) (quoting *Terry v. Terry*, 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981)).

28

{111} Although Gateway need not prove fraud to make out its UDTPA claim, *Edwards,* 128 N.C. App. at 574, 495 S.E.2d at 924, proof of fraud would necessarily constitute a UDTPA violation. *Bhatti v. Buckland*, 328 N.C. 240, 243, 400 S.E.2d 440, 442 (1991).

{112} Construing the disputed facts in the light most favorable to Gateway, Haynes's alleged conduct (and Mullen/LHC's ensuing silence)[13] may well have been fraudulent and was certainly unethical. At a minimum, it had the capacity or tendency to deceive, and Gateway's evidence is that—in reliance on Hayne's promises—Gateway was deceived into undertaking a host of commitments that it would not otherwise have made and also failed to pursue other business. (Pl.'s Br. in Resp. to Def. Mullen's Mot. for Summ. J. 28-29, June 23, 2006.)

{113} Mullen/LHC's retort that these facts allege at best a mere breach of contract misses the point. I agree with the views expressed in *Broussard v. Meineke Discount Muffler Shops, Inc.* that trial courts should keep "open-ended tort damages from distorting contractual relations" and must be vigilant against a party's attempt "'to manufacture a tort dispute out of what is, at bottom, a simple breach of contract claim[,]'" a practice that is "'inconsistent both with North Carolina law and sound commercial practice.'" 155 F.3d 331, 346 (4th Cir. 1998) (quoting *Strum v. Exxon Co.*, 15 F.3d 327, 329 (4th Cir. 1994)).

{114} Nevertheless, in summoning *Broussard* for support*,* Mullen/LHC incorrectly focuses on its purported right to cancel the One-Sheet Program once the parties began performing in 2005. The factual crux of Gateway's UDTPA claim, however, centers on (a) Haynes's alleged misrepresentations during the parties' contract negotiations, when he induced Gateway to

---

[13] The court is aware that silence generally is not actionable as fraud unless there is a duty to speak, which in turn, arises from a relationship of trust, confidence, inequality of condition and knowledge, or other attendant circumstances*. Setzer v. Old Republic Life Ins. Co.*, 257 N.C. 396, 399, 126 S.E.2d 135, 137 (1962). Regardless, the critical question is whether Mullen/LHC's acts, taken as a whole, had a capacity or tendency to deceive; Gateway need not prove all of the elements of common law fraud. *See generally Pierce v. Am. Defender Life Ins. Co.*, 316 N.C. 461, 470, 343 S.E.2d 174, 180 (1986).

commit to the 2005 One-Sheet Program by reassuring Gateway's president that it was guaranteed a one-year term, all the while knowing that he had no authority to make such a commitment; and (b) Mullen/LHC's failure to set the record straight.[14]  These facts are sufficient to withstand Mullen/LHC's motion for summary judgment as to the UDTPA claim but, because they are disputed, Gateway also is not entitled to summary judgment.  *See Phelps-Dickson Builders*, 172 N.C. App. at 439, 617 S.E.2d at 671 (reversing summary judgment for defendant on UDTPA claim where defendant's agent made oral misrepresentations that were inconsistent with the parties' written contract); *Process Components, Inc. v. Baltimore Aircoil Co., Inc.*, 89 N.C. App. 649, 654, 366 S.E.2d 907, 911 (1988) (holding that defendant-manufacturer's acts were sufficiently deceptive when defendant promised plaintiff an exclusive distributorship while defendant was still bound to an agreement with another distributor).

{115}  Mullen/LHC's insistence that it did not authorize Haynes to act does not bar Gateway's claim.  In the first place, there is a genuine factual dispute as to Haynes's apparent authority, an issue that the Court may not resolve on summary judgment.

{116}  Apparent authority is defined as "that authority which the principal has held the agent out as possessing or which he has permitted the agent to represent that he possesses."  *Zimmerman v. Hogg & Allen*, 286 N.C. 24, 31, 209 S.E.2d 795, 799 (1974).  Moreover, an employer is liable for an agent's fraud when committed within the scope of an agent's apparent authority, "even though the principal did not know or authorize the commission of the fraudulent acts."  *Norburn v. Mackie*, 262 N.C. 16, 23, 136 S.E.2d 279, 284-85 (1964).

---

[14] Additionally, even if, as Mullen/LHC insists, the insertion orders purport to be the entire contract between the parties, Gateway would nevertheless be able to introduce parol evidence of Haynes's additional promise where such statements are offered to prove a UDTPA claim.  *See Torrance v. AS & L Motors, Ltd.*, 119 N.C. App. 552, 554-55, 459 S.E.2d 67, 68 (1995).

{117} "[T]he determination of a principal's liability in any particular case must be determined by what authority the third person in the exercise of reasonable care was justified in believing that the principal had, under the circumstances conferred upon his agent." *Zimmerman*, 286 N.C. at 31, 209 S.E.2d at 799.

{118} This statement of the law answers Mullen/LHC's argument that Gateway could not reasonably have relied on Haynes's alleged misrepresentations in the face of written insertion orders stating expressly that its performance could be cancelled on 60-days notice. Whether a person exercised reasonable care is generally an issue of fact to be resolved by a jury. *Cf. Moore v. Crumpton*, 306 N.C. 618, 624, 295 S.E.2d 436, 440 (1982) (stating that "[e]ven where there is no dispute as to the essential facts, where reasonable people could differ with respect to whether a party acted with reasonable care, it ordinarily remains the province of the jury to apply the reasonable person standard.").

{119} Understandably, Mullen/LHC would like me to conclude that Gateway's reliance here was unreasonable as a matter of law. But, as our Supreme Court has noted:

> The law does not require a prudent man to deal with everyone as a rascal and demand covenants to guard against the falsehood of every representation which may be made as to facts which constitute material inducements to a contract; [instead] there must be a reliance on the integrity of man or else trade and commerce could not prosper. . . . Just where reliance ceases to be reasonable and becomes such negligence and inattention that it will, as a matter of law, bar recovery . . . is frequently very difficult to determine. . . . In close cases, however, we think that a [party to an action] . . . should not be permitted to say in effect, 'You ought not to have trusted me. If you had not been so gullible, ignorant, or negligent, I could not have deceived you.' Courts should be very loath to deny an actually defrauded plaintiff relief on this ground.

*Johnson v. Owens*, 263 N.C. 754, 758, 140 S.E.2d 311, 314 (1965) (internal citations and quotations omitted).

{120} There is conflicting evidence as to Haynes's apparent authority to commit Mullen/LHC to a one-year guaranteed term for the 2005 One-Sheet Program, and consequently, there is a genuine issue of material fact as to whether Gateway acted reasonably in relying on Haynes's alleged statements that Mullen/LHC had committed to such a guarantee. *See First Union Nat'l. Bank v. Brown*, 166 N.C. App. 519, 527-28, 603 S.E.2d 808 (2004) (stating that "the law of apparent authority usually depends upon the unique facts of each case . . . . [And where] the evidence is conflicting or susceptible to different reasonable inferences, the nature and extent of an agent's authority is a question of fact to be determined by the trier of fact.").[15]

{121} Accordingly, the Court **DENIES** the parties' cross-motions for summary judgment as to Gateway's UDTPA claim.

**E.**

**DAMAGES FOR DIMINUTION IN BUSINESS VALUE**

{122} Mullen/LHC has also moved for summary judgment as to the proper measure of damages, arguing that Gateway has improperly attempted to expand the scope of damages to include recovery of almost $14.5 million arising from the alleged diminution in value of Gateway's business.

{123} Gateway responds that such damages are recoverable under the facts of this case and has moved to supplement the record with testimony given by Mullen/LHC's expert in other cases to prove the point.

---

[15] The Court acknowledges those cases barring UDTPA claims involving misrepresentations concerning the terms of a contract. *See, e.g., Spartan Leasing Inc of N.C., v. Pollard*, 101 N.C. App. 450, 400 S.E.2d 476 (1991). I also recognize that persons executing written contracts have a duty to read them and ordinarily are charged with knowledge of their contents. *Id.* at 456, 400 S.E.2d at 479. In this case, however, I have found that a contract did not exist in October 2004, as contended by the Plaintiff. Moreover, the evidence, taken in the light most favorable to Gateway, is that its president inquired as to the omission in the insertion orders regarding the guaranteed one-year term and was assured by Mullen/LHC's agent that it was an administrative error. Given that Gateway did not have a direct contractual relationship with RJRT, the ultimate beneficiary of its services, but instead relied on Mullen/LHC to advise it as to the scope of its performance of the One-Sheet Program, it is for a jury to decide whether Gateway acted reasonably.

{124}  I conclude that damages for diminution in Gateway's business value are not recoverable in this case and, therefore, will **GRANT** Mullen/LHC's motion and **DENY** Gateway's motion to supplement the record.

{125}  As noted earlier, Gateway's UDTPA claim is essentially a claim alleging fraud in the inducement.  According to our Supreme Court, "[t]he measure of damages for fraud in the inducement of a contract is the difference between the value of what was received and the value of what was promised, and is potentially trebled by N.C.G.S. § 75-16."  *River Burch Assocs. v. City of Raleigh*, 326 N.C. 100, 130, 388 S.E.2d 538, 556 (1990) (internal citation omitted).

{126}  In this case, that measure of damages is the difference between Gateway's expected profit had it been allowed to perform for the full year and the amount Gateway was actually paid before being terminated in February 2005, with any such award potentially trebled.  *See Horne v. Cloninger*, 256 N.C. 102, 104, 123 S.E.2d 112, 113 (1961) ("The jury, having established the fraud, should have awarded as damages the difference between the actual value and the value if the [property] had been as represented.").

{127}  The Court declines Gateway's invitation to expand the scope of damages beyond the rule announced in *Horne*.  Gateway relies on *Pleasant Valley Promenade v. Lechmere, Inc.*, 120 N.C. App. 650, 464 S.E.2d 47 (1995) as authority for pursuing "diminution in business value" damages.  That decision, however, does not support such a result here.

{128}  In *Pleasant Valley Promenade,* the plaintiff limited partnership operated a shopping center that included a department store chain, defendant Lechmere, Inc., ("Lechmere"), as its anchor store tenant.  Although Lechmere owned the property upon which it operated its business, it was bound by a restrictive covenant with the shopping center developer to operate its store for

seven years. Lechmere, however, closed the store after only two years of operation and thereafter leased the space to a discount pharmacy chain. *Id.* at 654-55, 464 S.E.2d at 52-53.

{129} Plaintiff in that case alleged claims for breach of contract, fraud, and unfair and deceptive trade practices. The trial court granted a partial directed verdict on plaintiff's fraud and UDTPA claims and set aside the jury's verdict of $8 million on the breach of contract claim. *Id.* at 655, 464 S.E.2d at 53.

{130} The resulting cross-appeals raised a host of issues, including the proper scope of damages for the breach of contract claim. The precise question before the Court of Appeals was "whether diminished market value is recoverable in a breach of contract action arising out of an anchor store's breach of covenants with the shopping center in which it resides." *Id.* at 666, 464 S.E.2d at 59.

{131} As to that question, our Court of Appeals expressed the general rule that "'for a breach of contract the injured party is entitled as compensation therefor to be placed, insofar as this can be done by money, in the same position he would have occupied if the contract had been performed.'" *Id.* at 665, 464 S.E.2d at 59 (quoting *First Union Nat'l Bank of N.C. v. Naylor*, 102 N.C. App. 719, 725, 404 S.E.2d 161, 164 (1991)).

{132} To that end, the Court agreed with the views of other courts that diminished market value may be an appropriate measure of contractual damages measure where the harm suffered will not otherwise be fully compensated. *Id.* at 667, 464 S.E.2d at 60 (citing *United Roasters, Inc., v. Colgate-Pamolive Co.*, 649 F.2d 985 (4th Cir. 1981)).

{133} But the specific holding in *Pleasant Valley Promenade* was very narrow, i.e., that "diminution in market value may be applied to redress breach of contract occurring between an anchor store and the shopping center in which it resides[.]" *Id.* at 671, 464 S.E.2d at 62.

34

According to the Court of Appeals, recovery of diminution in business value damages is particularly appropriate in such a context because of the cooperative enterprise that is a shopping center, "with each store's success dependent on the continued operation of the other stores . . . ." and the critical role of the anchor store in the financial success of the entire shopping center. *Id.* (quoting *Dover Shopping Ctr., Inc. v. Cushman's Sons, Inc.*, 63 N.J. Super. 384, 164 A.2d 785, 790 (N.J. Super. Ct. App. Div. 1960)). As the Court of Appeals explained:

> The function of the anchor is to provide certainty of income stream, an identity and stability for the center which, in turn, draws customers, attracts other tenants and increases overall sales. Further, without an anchor store long-term financing is virtually impossible to obtain. Therefore, the anchor's loss has been described as worse than a flood, fire or tornado, because usually there is insurance to cover natural disasters.

*Id.* at 670, 464 S.E.2d at 61 (internal citations and quotations omitted).

{134} The case before me does not mirror the unique harm caused by a defendant who executes a seven-year covenant to operate its business as the anchor tenant for a shopping center, and then abandons the center less than two years later. Rather, the facts here involve a corporate entity spun off from its predecessor, whose sole *raison d'être* was to manage a single line of business pursuant to annual contracts that, taken in the light most favorable to Gateway, guaranteed a revenue stream for only one year.

{135} I acknowledge that unfair and deceptive trade practices and unfair competition claims are neither wholly tortious nor wholly contractual in nature and the measure of damages is broader than common law actions. *Bernard v. Cent. Carolina Truck Sales, Inc.*, 68 N.C. App. 228, 230, 232, 314 S.E.2d 582, 584-85 (1984). Nevertheless, a diminution in business value theory of damages has no place here. As the Eleventh Circuit held on facts remarkably similar to those before me, where a plaintiff business elects to serve one client and is "a creature of the contract" with that client, the business has value only to the extent that the client chooses to renew the

35

contract. *Mark Seitman & Assocs., Inc., v. R.J. Reynolds Tobacco Co.*, 837 F.2d 1527, 1532 n.7 (11th Cir. 1988).

{136} The Court has already determined that Gateway's claim for breach of contract fails, and that the damage to Gateway, if any, arises, not from any alleged contractual breach, but as a result of the alleged actions of Mullen/LHC's agent in fraudulently inducing Gateway to perform.

{137} Except by virtue of the statutory trebling of damages that arises from these facts, however, Gateway's actual damages are the same whether the case proceeds as a contract action or as a UDTPA claim. That is, Gateway is entitled to recover the difference between the value of what was received (i.e., the profits earned and paid before Gateway's termination) and the value of what was promised (i.e., the profits Gateway would have earned for the full year).

{138} Gateway concedes that Mullen/LHC was not obligated to retain it as a one-sheet vendor beyond 2005. (Brad Heard Dep. 225:14-20; Guldner Dep. 191:19-25.) Moreover, Gateway came to life following a business decision by its predecessor, Gateway Outdoor Advertising, Inc., at the request of its lender, to fragment its revenue stream to facilitate access to capital. (Craig Heard Aff. ¶¶ 1, 4-5, Apr. 5, 2006.) To then claim that a three-year-old company with revenues tied almost exclusively to a single client suffered almost $14.5 million in diminution in business value damages, in addition to over $3 million in lost profits, following a decision to terminate an alleged one-year contract is, I conclude, unbounded speculation.

{139} Moreover, although couched as a figure purporting to assess Gateway's diminished business value, Gateway's damages calculation is nothing more than an estimate of its lost profits for the years ending 2006-2010, discounted to their present value. North Carolina courts, however, "have long held that damages for lost profits will not be awarded based upon

36

hypothetical or speculative forecasts of losses." *Iron Steamer, Ltd. v. Trinity Rest., Inc.*, 110 N.C. App. 843, 847, 431 S.E.2d 767, 770 (1993).

{140} In this case, Gateway's calculation of diminished business value damages is based on two assumptions. The first, that Mullen/LHC would renew the one-sheet contract for 2006 and beyond, is unfounded given the facts, and the second, that Gateway would have been able to solicit a comparable level of business with more notice of its eventual termination, is speculative given that Gateway had no established history of profits from clients other than Mullen/LHC. *See generally Old Well Water Inc., v. Collegiate Distrib. Inc.*, 2002 N.C. App. LEXIS 1939, at *12 (N.C. Ct. App. June 18, 2002) (affirming dismissal of a claim for lost profits where plaintiff was a new business with no history of established profits and the evidence of projected profits was speculative).

{141} And while it is true that North Carolina has no *per se* rule that precludes an award of damages for lost profits where a business has no recent record of profitability, such businesses, like established businesses, must prove lost profits with reasonable certainty. *Olivetti Corp. v. Ames Bus. Sys., Inc.*, 319 N.C. 534, 546, 356 S.E.2d 578, 585 (1987). Put another way, the plaintiff must show "that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty." *Id.* at 547-48, 356 S.E.2d at 586.

{142} In this case, Gateway had no expectation of serving as a one-sheet vendor beyond 2005, and Gateway has presented no evidence to show that a company created for the sole purpose of managing a single line of business could, in fact, diversify its operations so as to generate future revenues equivalent to those lost by the termination of its relationship with its only client.

{143} Accordingly, because Gateway's estimate regarding "diminution in business value" damages is based on assumptions that are either unfounded or purely speculative, the Court **GRANTS** Mullen/LHC's motion for summary judgment as to this issue and will exclude any evidence of "diminution in business value" damages.

{144} Also before the Court is Gateway's motion for further supplementation as to the damages issue. Gateway seeks to submit the deposition testimony of Mullen/LHC's expert, given in other cases, wherein he purportedly agreed that "diminution in business value" damages are an appropriate measure of damages.

{145} In light of my ruling above, this issue is moot. Regardless, in determining the proper measure of damages, the Court cares not what an expert thinks, but only what North Carolina law provides. Accordingly, the Court **DENIES** Gateway's motion to supplement.

**F.**

**UNASSERTED DEFENSE**

{146} Finally, Gateway moves for judgment as a matter of law to prevent Mullen/LHC from defending against Gateway's breach of contract and unfair and deceptive trade practices claims on the basis of the allegedly unlawful "consulting" payments made by Gateway to Haynes.

{147} Gateway argues, among other things, that Mullen/LHC has waived the matter by failing to plead it as an affirmative defense or, alternatively, by entering into the 2005 contract with Gateway with full knowledge of the allegedly improper payments. (Br. in Supp. of Pl.'s Mot. for Summ. J. Regarding Proposed but Unasserted Defense of Def. Mullen 10-11, May 31, 2006.)

{148} Mullen/LHC responds that Gateway's payments to Haynes were in fact "kickbacks" that provided independent grounds to terminate the one-year contract (if one existed) regardless of

38

whether the payments were pled as an affirmative defense. (Mullen's Resp. to Mot. for Summ. J. Regarding "Unasserted Defense" 6, June 23, 2006.)

{149} The Court **DENIES** Gateway's motion. In the first place, whether the alleged kickbacks provided sufficient grounds to terminate the contract is moot, as I have dismissed Gateway's breach of contract claim.

{150} Second, it is unclear whether the alleged kickbacks would be an affirmative defense to Haynes's alleged misrepresentation that the 2005 insertion orders were guaranteed for a full year, given the disputed facts as to the nature of the payments and the relative knowledge of the parties. Regardless, because Mullen/LHC has not asserted the kickbacks as an affirmative defense to any claim, I decline to address it on summary judgment but do not foreclose further consideration of the issue at trial.

## CONCLUSION

{151} Based upon the foregoing, the Court:

(a) **GRANTS** Mullen Advertising's motion to dismiss all claims in 05 CVS 7255;

(b) **DENIES** Gateway's Motion for Summary Judgment as to its claim for breach of contract;

(c) **GRANTS** Mullen/LHC's Motion for Summary Judgment as to Gateway's claim for breach of contract;

(d) **DENIES** the parties' cross-motions for summary judgment as to Gateway's claim alleging Unfair and Deceptive Trade Practices;

(e) **GRANTS** Mullen/LHC's Motion for Partial Summary Judgment and Other Relief Regarding Damages for "Diminution in Business Value" and also **GRANTS** Mullen/LHC's separate motion to exclude any expert testimony as to this issue;

39

(f)	**DENIES** Gateway's Motion for Leave to Submit Additional Materials in Opposition to Defendants' Motion for Partial Summary Judgment and Other Relief Regarding Damages for "Diminution in Business Value;" and,

(g)	**DENIES** Gateway's Motion for Summary Judgment Regarding Proposed but Unasserted Defense.

This the 19th day of January, 2007.