This is an action to recover damages for breach of an alleged contract to lend the plaintiff $1,000. *Page 507 
The plaintiff offered evidence tending to prove that he held a life policy in the defendant company, and that in 1910 he applied to the defendant to lend him $1,000; that he told J. F. Stokes, an agent of the defendant, who had authority to solicit insurance and to collect premiums, but no authority to make loans or take applications therefor, that he wanted some money, and that Stokes said he could get some; that most of the correspondence in reference to the loans was between the said Stokes and the defendant; that the security named for the loan by the plaintiff was a mortgage on real estate; that before loans were made by the defendant, it was required by its by-laws that the title to the property offered as security should be passed on by its attorney and the loan approved by its finance committee; that prior to a written application for the money, the general manager of the defendant said to Stokes, in reference to the loan to the plaintiff: "Go take his application and get up his papers, and if his security is all right, we will lend it to him right away"; that in a few days thereafter a written application for the money and an abstract of the title to the real estate offered as security were forwarded to the defendant; that soon thereafter the said Stokes went to the home office of the defendant and had a conversation with the president and general counsel of the defendant, whose duty (621) it was to pass on the title, and asked him about the loan to the plaintiff, and he replied that he thought the loan was made; that the papers and everything left his office several days prior to that time and all had been approved, and that the loan had been approved; that the said Stokes told the plaintiff of his conversation with the general manager and the president, but he was not directed to do so by either; that the plaintiff told the said Stokes that he wanted to pay some debts, to rebuild his mill, and to aid in cultivating his farm with the money, and that Stokes communicated this to the general manager; that by reason of his failure to get the money, he was not able to pay his debts and his credit was impaired; that his mill washed out and the yield of his crops was decreased.
The application was not introduced in evidence, and there is nothing to indicate the terms of the loan or the time when it was to be payable, nor is there any evidence that the plaintiff was not able to borrow the money elsewhere on the same security. There was much correspondence between the parties, and soon after it closed the plaintiff borrowed $1,200 on the security offered to the defendant.
The defendant, through its general manager, wrote the said Stokes the following letters in regard to the loan, the contents of which were communicated to the plaintiff, the parts of the letters not bearing on this controversy being omitted: *Page 508 
KINSTON, N.C. 14 February, 1910.
I have your favor of the 10th inst., inclosing abstracts of the Elks property, and write to say that I will push this through as rapidly as possible. Will turn it over to our finance committee to-day. If the security is all right — that is to say, satisfactory to them — I think we ought to be able to get it through within a week or ten days.
KINSTON, N.C. 2 March, 1910.
Replying to your favor of the 1st inst., concerning the Elks loan, I beg to say that the investigation and examination of title and (622) preparation of papers, etc., has been about completed, I think. The fact is, that I have been away from the home office so much that I have been unable to give it personal attention; and the further fact, is that I have to leave to-night to attend Gaston court. I will not be able to return until the last of this week, and during the first two days of next week will be quite busy with the directors' meeting and the stockholders' meeting. Immediately after that I will endeavor to get this matter closed up quickly, and think I can safely promise to do so.
KINSTON, N.C. 24 June, 1910.
Our executive committee has decided to grant Mr. Corey an extension to the first of December. This extension, and the extension of a much larger loan which was to have been repaid, has made it out of the question for us to effect any new loans at the present time. However, I will say to you that we are endeavoring to be in shape to take care of the Elks matter in the not far distant future. It is impossible for me to tell you at just what time this can be done, but I assure you that it shall be done at the earliest possible moment.
Regretting very much that there should ever have been any delay or misunderstanding about this matter, and with kindest regards and best wishes, I remain,
KINSTON, N.C. 27 June, 1910.
Now, as to your position with reference to the Elks matter, I beg to say that while the income is exceedingly slim during the summer months, I shall watch it every day, and at the very first possible opportunity I shall see that the Elks matter is closed up and the money sent to him.
KINSTON, N.C. 9 September, 1910.
Replying to your favor of the 7th inst., in which you make inquiry as to whether or not we will be able to handle the Elks loan by 1 October, I beg to advise that it now appears impossible for us to do this by 1 October. Collections have been very dull during the summer, and so has *Page 509 
business generally, while our outgo has been considerably larger than usual in every direction. As you say, collections are looking up very sharply now, but I have no idea they will be sufficient to (623) justify me in promising to handle the Elks loan by 1 October. I wish I could do so. You can rest assured that both the Elks and the May loans will be taken up at the very first available opportunity — that is, so far as I am at liberty to make a promise in the matter.
KINSTON, N.C. 2 November, 1910.
Replying to your favor of 2nd inst., in re loan to Mr. Elks, I am very sorry that I failed to write you promptly to the effect that our committee would not take any except regular action in this matter.
You will recall that I promised you that, in so far as I could control the matter, the loan to Mr. Elks should be the first one made. That is as far as I can go now, except to express the hope that this matter will not have to "hang fire" very much longer.
KINSTON, N.C. 3 December, 1910.
Replying to your favor of the 30th ult., in which you inclose abstract of title of lands of Mr. Z. T. Evans, I beg to say that I have submitted this, and the Elks and May loans also, and am directed to say to you that the company will be compelled to decline making these loans, because of expenditures that have been decided upon in connection with the extension of the company's business, and the Intermediate Department particularly.
At the conclusion of the evidence, his Honor, being of opinion that the plaintiff had failed to prove a contract, entered a judgment of nonsuit, and the plaintiff excepted and appealed.
This appeal presents one question for our decision, and that is, whether the evidence introduced by the plaintiff, construed most favorably for him, establishes a contract between him and the defendant.
Before considering the evidence, it is well to have in mind some of the elements that enter into a valid contract, so that we may see if the plaintiff has met the requirements of the law.
It is elementary that it is necessary that the minds of the (624) parties meet upon a definite proposition. "There is no contract unless the parties thereto assent, and they must assent to the same thing, *Page 510 
in the same sense. A contract requires the assent of the parties to an agreement, and this agreement must be obligatory, and, as we have seen, the obligation must, in general, be mutual." 1 Par. Con., 475.
If the alleged contract is made by conversations and correspondence, the whole must be considered, and although certain parts taken alone appear to constitute a binding agreement, if the whole correspondence and negotiations show that there were other terms contemplated by both parties, as essential to the proposed contract, on which they fail to agree, there is no contract. Hussey v. Horne-Payne, 4 App. Cases, 312.
The leading opinion in this case was written by Lord Cairns, and LordSelborne, concurring, sums up the conclusion of the Court as follows: "The observation has often been made that a contract established by letters may sometimes bind parties who, when they wrote those letters, did not imagine that they were finally settling the terms of the agreement by which they were to be bound; and it appears to me that no such contract ought to be held established, even by letters which would otherwise be sufficient for the purpose, if it is clear, upon the facts, that there were other conditions of the intended contract, beyond and besides those expressed in the letters, which were still in a state of negotiation only, and without the settlement of which the parties had no idea of concluding any agreement."
If the minds of the parties meet upon a proposition, which is sufficiently definite to be enforced, the contract is complete, although it is in the contemplation of the parties that it shall be reduced to writing as a memorial or evidence of the contract; but if it appears that the parties are merely negotiating to see if they can agree upon terms, and that the writing is to be the contract, then there is no contract until the writing is executed. Winn v. Bull, 7 Ch. D., 31; Pratt v. R. R.,21 N.Y., 308; Steam Co. v. Swift, 41 Am. St., 553 (86 Me. 248); Rankin v.Mitchem, 141 N.C. 280.
(625) In the case from Maine, the authorities, English and American, are reviewed, and the Court says: "From these expressions of courts and jurists, it is quite clear that, after all, the question is mainly one of intention. If the party sought to be charged intended to close a contract prior to the formal signing of a written draft, he will be bound by the contract actually made, though the signing of the written draft be omitted. If, on the other hand, such party neither had nor signified such an intention to close the contract until it was fully expressed in a written instrument and attested by signatures, then he will not be bound until the signatures are affixed. The expression of the idea may be attempted in other words; if the written draft is viewed by the parties merely as a covenant memorial or record of their previous contract, its absence does not affect the binding force of the contract; if, *Page 511 
however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally signed. In determining which view is entertained in any particular case, several circumstances may be helpful, as: whether the contract is of that class which are usually found to be in writing; whether it is of such nature as to need a formal writing for its full expression; whether it has few or many details; whether the amount involved is large or small; whether it is a common or unusual contract; whether the negotiations themselves indicate that a written draft is contemplated as a final conclusion of the negotiations. If a written draft is proposed, suggested, or referred to, during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract."
Contracts are usually made by an offer by one party and an acceptance by the other; and it is in this way, the plaintiff contends, a contract was completed between him and the defendant.
When an offer and acceptance are relied on to make a contract, "The offer must be one which is intended of itself to create legal relations on acceptance. It must not be an offer intended merely to open negotiations which will ultimately result in a contract, or intended to call forth an offer in legal form from the party to whom it is addressed." 1 Page on Contracts, sec. 26.
"The offer, even if intended to create legal relations, must (626) be so complete that upon acceptance an agreement is formed which contains all the terms necessary to determine whether the contract has been performed or not. An offer in which the price is not fixed, and yet is so specified that it is evidence that the parties did not intend merely whatever should be a reasonable compensation, is not definite enough." 1 Page on Contracts, sec. 27.
"The offer must not merely be complete in terms, but the terms must be sufficiently definite to enable the court to determine ultimately whether the contract has been performed or not. If no breach of the contract could be assigned which could be measured by any test of damages from the contract, it has been said to be too indefinite to be enforcible, and this vice is usually due to the form of the offer." 1 Page on Contracts, sec. 28.
The same principle is declared in Tanning Co. v. Telegraph Co.,143 N.C. 378, in which Justice Brown, speaking for the Court, says: "The offer must be distinct as such, and not merely an invitation to enter into negotiations upon a certain basis. Wire Works v. Sorrell, 142 Mass. 442;Beaupre v. Telegraph Co., 21 Minn. 155; 24 Am. Eng. Ency., 1029, and cases cited. Again, the offer must specify the specific quantity to be furnished, as a mere acceptance of an indefinite offer will not create a binding contract. McCaw Manufacturing Co. v. *Page 512 Felder, 115 Ga. 408; 24 Am. Eng. Ency., 1030, note 1, and cases cited. `The offer must be one which is intended of itself to create legal relations on acceptance. It must not be an offer merely to open negotiations which will ultimately result in a contract.' 1 Page on Contracts, sec. 26, and cases cited; Clark on Contracts, sec. 29."
If the minds of the parties have met, and the terms have been agreed to, it does not always follow that a contract is complete and such a one as can be enforced, although not illegal, as the law demands that the terms shall be definite and certain, or capable of being made so. Silverhorne v. Fowle,49 N.C. 363; Spragins v. White, 108 N.C. 453; Thomas v. Shooting Club,123 N.C. 287; Price v. Price, 133 N.C. 515.
(627) In the first of these cases it was held that a contract to tow a raft of timber was void on account of indefiniteness, which provided that the raft was "to be ready when corn was done," and in the last the Court says: "That an agreement may be valid, it is necessary that the parties use language sufficiently clear for it to be understood with reasonable certainty what they mean; and if an agreement is so vague that it is not possible to gather from it the intention of the parties, it is void, for neither the court nor the jury can make an agreement for the parties."
Having determined the elements entering into a completed contract under conditions existing between the plaintiff and the defendant, let us see if the plaintiff has met the requirements of the law.
We are of opinion he has not.
(1) When all the evidence is considered, including the correspondence, it amounts to no more than negotiations for a contract, and the conduct of the plaintiff shows that he so understood it. He claims now that the finance committee of the defendant approved his application, and that this made the contract complete; but he made no such claim when the contents of the letters set out in the evidence were communicated to him.
(2) No promise on the part of the defendant, express or implied, to lend the plaintiff $1,000 is proven. The approval by the finance committee, if made, was not such. It is merely a safeguard adopted by the defendant as preliminary to a loan. The attorney passes upon the title and the committee examines the security and the conditions of the finances, and if the reports of both are favorable, the defendant makes the loan.
(3) The agreement, as contended for by the plaintiff, shows that the transaction was not completed, and that other terms were to be agreed to, or it is so indefinite that it cannot be enforced.
The plaintiff says he offered to borrow $1,000 of the defendant, and that the defendant accepted his offer. It is agreed that a note and *Page 513 
mortgage were to be executed by the plaintiff to consummate the contract, but he tendered neither to the defendant. The reason he did not is obvious. He did not know how to write the note and mortgage, and no lawyer could have prepared them, because stipulations (628) necessary to a complete contract had not been discussed or agreed to, to wit, the time the loan was to run. It is certain the plaintiff did not intend to borrow $1,000 payable one day after date, because he says he needed the money to use in payments of debts, in repairing a mill, and in cultivating crops, and if not payable one day after date when was it to be due? Suppose the defendant had said: "Prepare your note and mortgage, and I will lend you the money payable in two months," or three months, or six months; is it not certain that the plaintiff had the right to say: "I do not want the money on such short time, and have not promised to take it"; and if the plaintiff had said the note must become due one year or two years from date, that the defendant could have declined to lend on such terms, because it had not promised to do so?
If so, terms which were necessary to complete the contract had not been agreed to.
The right of action on contracts to lend money is considered in Coles v.Lumber Co., 150 N.C. 188, but the discussion there is not material in this case, as the Court was then dealing with the measure of damages, and not with the question whether a contract had been made.
We are of opinion that no contract has been established, and that the judgment of nonsuit was properly entered.
Affirmed.
Cited: Steel Co. v. Copeland, ante, 560; Baynes v. Harris, 160 N.C. 309;Wilson v. Scarboro, 163 N.C. 388; Wooten v. Drug Co., 169 N.C. 68.