Kapur v. IMW EMR, LLC, 2020 NCBC 92.

| | |
|---|---|
| STATE OF NORTH CAROLINA<br><br>WAKE COUNTY<br><br>ANISH KAPUR,<br><br>   Plaintiff,<br><br>  v.<br><br>IMW EMR, LLC d/b/a EYE CARE LEADERS; ECL GROUP, LLC d/b/a EYE CARE LEADERS; IMEDICWARE, INC. d/b/a EYE CARE LEADERS; ELI GLOBAL, LLC; and GREG E. LINDBERG,<br><br>   Defendants. | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION<br>20 CVS 5753<br><br><br><br>**ORDER AND OPINION ON DEFENDANTS' MOTION TO DISMISS** |

THIS MATTER is before the Court on Defendants' Motion to Dismiss Plaintiff's Complaint under North Carolina Rule of Civil Procedure ("Rule(s)") 12(b)(6) (the "Motion to Dismiss" or the "Motion"). For the reasons stated below, the Motion is GRANTED in part and DENIED in part.

*K&L Gates LLP, by Zachary S. Buckheit, A. Lee Hogewood, III, and Matthew T. Houston, for Plaintiff.*

*Fox Rothschild LLP, by Matthew Nis Leerberg and Troy D. Shelton, and Condon Tobin Sladek Thornton PLLC, by Kendal B. Reed and Aaron Z. Tobin, for Defendants.*

Gale, Senior Judge.

## I. INTRODUCTION

2. Plaintiff Anish Kapur ("Kapur" or "Plaintiff") contends he is entitled to unpaid commissions earned during the course of his employment by one or more

Defendants. His Complaint asserts nine separate claims for relief. (Verified Compl. [hereinafter "Compl."], ECF No. 4.) Defendants seek to dismiss each of them. For the reasons discussed below, the Court concludes that some but not all of Plaintiff's claims survive.

## II. FACTUAL BACKGROUND

3. The Court does not make findings of fact when ruling on a motion to dismiss under Rule 12(b)(6). *See, e.g.*, *Concrete Serv. Corp. v. Invs. Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986). The Court states the relevant allegations in the Complaint construed in Plaintiff's favor without being bound to its legal conclusions.

4. Plaintiff, a medical doctor, worked for iMedicware, Inc. ("iMedicware) from September 2014 to November 2017 as Vice President of Sales and Marketing. (Compl. ¶¶ 30–31.) iMedicware is "a provider of integrated electronic health record, practice management, ambulatory surgery center software, and optical solutions designed for eye care practices." (Compl. ¶ 31.) In his role, Plaintiff "negotiat[ed] agreements with eye care physicians and other eye care providers[.]" (Compl. ¶ 32.) Plaintiff was compensated with both a salary and commissions calculated as 10% of gross sales on a contract-by-contract basis. (Compl. ¶¶ 33–34.)

5. Plaintiff is the sole owner and manager of The Iron Trust, LLC ("The Iron Trust"), a former shareholder of iMedicware. (Compl. ¶ 36.)

6. In 2017, representatives of "Eye Care Leaders," including Peter Nordberg ("Nordberg"), general counsel for Defendant Eli Global, LLC ("ELI Global"),

discussed a potential purchase of iMedicware. (Compl. ¶ 35.)[1] Nordberg received information regarding Plaintiff's compensation, including his commission rate. (Compl. ¶ 38.) During negotiations for the purchase of iMedicware, Nordberg and other representatives of Defendants "indicated to Plaintiff and his representatives that [he] would be compensated after closing in a manner consistent with his then-existing arrangement with iMedicware." (Compl. ¶ 39.)

7.      Defendant IMW EMR, LLC ("IMW") is a North Carolina limited liability company.     (Compl. ¶ 3.)  Plaintiff alleges that IMW does business as Eye Care Leaders and has no independent business or identity other than being separately incorporated from the other corporate Defendants. (Compl. ¶¶ 3–4.)  On or about June 1, 2017, IMW entered into a stock purchase agreement with, among others, iMedicware and The Iron Trust (the "Purchase Agreement"), pursuant to which IMW agreed to acquire a controlling stake in iMedicware.  (Compl. ¶ 40.)  The Iron Trust sold its interests in iMedicware "based in part upon the representations made [to Plaintiff] by Mr. Nordberg and Eye Care Leaders' representatives regarding subsequent commission and payments." (Compl. ¶ 41.)  Plaintiff "would not have continued his employment with iMedicware . . . absent these representations." (Compl. ¶ 43.)

8.      IMW closed on the purchase on or about June 7, 2017. (Compl. ¶ 44.) Plaintiff expected to continue his employment in the manner and with the

---

[1] It is unclear what company or companies were operating pursuant to a trade name of Eye Care Leaders at this time.  On June 29, 2018, Defendant ECL Group, LLC ("ECL") filed an Assumed Business Name Certificate indicating that it would do business under the name of Eye Care Leaders. (Compl. ¶ 7; Assumed Bus. Name Certificate, ECF No. 4.1.)

compensation he had previously during his employment with iMedicware. In closing its purchase of iMedicware, "representatives of Eye Care Leaders represented to Plaintiff that a commission plan would be implemented for all deals that Plaintiff was closing." (Compl. ¶ 52.)

9. Plaintiff alleged he then became Vice President of Enterprise Solutions and Business Development "for the consortium known as Eye Care Leaders[.]" (Compl. ¶ 53.) In his Complaint, Plaintiff alleges that he continued work for "Eye Care Leaders" without specifying any particular company that was his immediate employer. At the hearing on the Motion, Plaintiff's counsel could not identify what company had issued a W-2 or 1099 or from which company Plaintiff reported compensation on his tax returns. Plaintiff avers that he generally continued working as he had with iMedicware, negotiating contracts with physicians and eye care providers. (Compl. ¶ 59.)

10. Plaintiff alleges that Eye Care Leaders agreed to compensate him at a commission rate based on the value of contracts that he "quarterback'd[,]" assisted, and acquired. (Compl. ¶ 60.) Specifically, he alleges that Michael Gallup ("Gallup"), who was then Eye Care Leaders' Chief Executive Officer ("CEO"), and Brandon Richards ("Richards") who was then Eye Care Leaders' Chief Human Resources Officer and Chief Legal Officer of Eli Global (and later, CEO of Eli Global), "assured Plaintiff that [his] commission rate would apply to all deals he signed or otherwise brought into Eye Care Leaders from the date of Eye Care Leaders' acquisition of

iMedicware[.]" (Compl. ¶ 62.) Plaintiff's base salary was adjusted but he has not been paid commissions. (Compl. ¶¶ 61, 64.)

11. On February 26, 2018, Eye Care Leaders representative Surinder Jain "confirmed with respect to Plaintiff's commissions that '[f]or post-acquisition period—commission can be paid[,]' " although pre-acquisition commissions would require approval from Gallup or Greg Lindberg ("Lindberg"), owner of Eli Global. (Compl. ¶¶ 66–67; Feb. 26 Email, ECF No. 4.3; *see* Compl. ¶ 23.) On April 2, 2018, Gallup emailed Plaintiff, "To start anything pre-acquisition I don't see paying. Post I don't understand why it wasn't paid in a normal process." (Compl. ¶ 69; Apr. 2 Email, ECF No. 4.3.)

12. On August 27, 2018, Gallup told Plaintiff during a telephone conversation that Plaintiff would receive a 4% commission for all "[q]uarterback'd [d]eals[,]" and a 2% commission for all assisted deals, together comprising the "Commission Plan." (Compl. ¶ 74.) Later that day, Plaintiff emailed Gallup "confirming the parties' arrangements and providing a spreadsheet of the amounts due and owing to Plaintiff." (Compl. ¶ 75.) Plaintiff requested by email that he and Gallup "put in place something that outline[d]" their telephone conversation. (Aug. Email Chain, ECF No. 4.4.) Gallup did not respond to the email, but forwarded it to Plaintiff's father who was the former CEO of iMedicware, (Compl. ¶ 65), stating that "[i]f we pay him out 440k for 2017 now it will sink the year[,]" (Aug. Email Chain; *see* Compl. ¶ 76). His father was separately negotiating an Equity Equivalent Agreement

("EEA"), and at some point Richards suggested that Plaintiff's commission claim could be addressed in the EEA. (*See* Compl. ¶ 85.)

13. On October 7, 2018, Richards emailed Plaintiff that he was "[s]till working on [Plaintiff's] commissions with [Gallup.]" (Compl. ¶ 77.) On October 8, 2018, Plaintiff sent Richards an updated spreadsheet of commissions due and owing, after which Richards and Plaintiff agreed that six of the listed commissions should not be paid, while Richards did not dispute the remaining commission amounts. (Compl. ¶ 78.)

14. On October 16, 2018, Richards emailed Plaintiff indicating that he had talked to Gallup and thought they "finally ha[d] this." (Compl. ¶ 79; Oct. 16 Email, ECF No. 4.6.) Later that day, Richards emailed Plaintiff a copy of a commission spreadsheet and "language that [he] developed with [Gallup] regarding 'QB'd deals vs Assisted, etc.'" (Oct. 16 Email [hereinafter "Oct. 16 Email II"], ECF No. 4.7.)

15. On October 19, 2018, Richards emailed Plaintiff a spreadsheet that he said would apply to 2018 contracts and updated the contract language to show what commissions Plaintiff "will be eligible for[.]" (Compl. ¶ 81; Oct. 19 Email, ECF No. 4.8.) Richards also made "slight modifications" to Plaintiff's calculations of the commission amount. (Compl. ¶ 83.) Plaintiff alleges that together this email and spreadsheet to which it refers constitute an admission that Plaintiff is entitled, at minimum, to $410,784.01, with $212,627.00 in dispute. (Compl. ¶¶ 96–98; *see* Oct. 19 Spreadsheet, ECF No. 4.8.) Plaintiff has not been paid any commissions to date. (Compl. ¶ 84.)

16. On November 15, 2018, Plaintiff requested payment on the amount he contends was agreed to, as well as a document to "formalize the arrangement[,]" (Compl. ¶ 85), complaining that he had been operating "without an employment agreement or comp structure[,]" (Nov. 15 Email, ECF No. 4.9). Plaintiff also specifically requested that his commissions not be addressed as a part of his father's EEA. (Compl. ¶ 85.)

17. On November 19, 2018, Richards told Plaintiff that his commissions were "already in [his father's] EEA," but refused to provide Plaintiff with a copy of the EEA. (Compl. ¶ 86; Nov. 19 Email, ECF No. 4.9.) Plaintiff learned the following day that his father's EEA did not actually provide for, or account for, Plaintiff's commissions in any way. (Compl. ¶ 87.) Plaintiff then requested that Eye Care Leaders amend the EEA to provide for his commissions, but Richards and other Eye Care Leaders representatives "refused to correct the EEA or to otherwise sign any document evidencing the Commission Plan." (Compl. ¶¶ 87–88.)

18. In or around May 2019, Plaintiff left his employment with Eye Care Leaders. (Compl. ¶ 90.) In August 2019, Plaintiff contacted Lindberg to request payment of his commissions, in response to which Lindberg told Plaintiff that "Sandeep Dua had assumed leadership of Eye Care Leaders and would resolve the payment issue with Plaintiff." (Compl. ¶¶ 99–100.) Plaintiff provided Sandeep Dua ("Dua") the spreadsheets and emails he had exchanged with Richards, but Dua refused to pay Plaintiff and claimed that "Eye Care Leaders had no information on Plaintiff or the amounts owed to him and could not verify the amounts requested[.]"

(Compl. ¶¶ 101–03.) Dua repeatedly informed Plaintiff that he could come back to work for Eye Care Leaders and earn back some of the money to which Plaintiff claimed he was entitled. (Compl. ¶ 104.) After Plaintiff refused, Dua conceded that Plaintiff was entitled to $53,396.90, but that he could not verify the remaining amounts. (Compl. ¶¶ 106–07.) Plaintiff has not been paid any amount. (Compl. ¶ 114.)

19. Plaintiff continued to seek payment through January and February 2020. (Compl. ¶ 107.) At some point, Eye Care Leader's Commercial Leader and Vice President of Global Sales, Bartley J. Gregg ("Gregg"), contacted Plaintiff and orally informed him that his "calculations and spreadsheets were correct" and that "Eye Care Leaders owed the full amount requested[.]" (Compl. ¶ 108–10.) Gregg represented that Dua and Kevin Isaacson ("Isaacson"), the Chief Customer Officer for Eye Care Leaders, had told him not to put anything regarding Plaintiff's entitlement to commissions in an email or other writing, (Compl. ¶ 111), that Isaacson had confirmed that "Eye Care Leaders and their attorneys knew and admitted that they owed Plaintiff in excess of $600,000 in [c]ommissions[,]" (Compl. ¶ 112), and that "they did not intend to pay those amounts, as they hoped Plaintiff would settle for a lower number[,]" (Compl. ¶ 112).

20. Plaintiff alleges that Gregg understood that Isaacson had said that "Eye Care Leaders would do everything in their power to 'make sure [they] don't pay him anything[,]' " (Compl. ¶ 112), and that Dua had said that "Eye Care Leaders would continue to refuse to make any payments, instead stringing Plaintiff along until they

were able to 'wear down' Plaintiff to accept whatever amount Eye Care Leaders might propose, if any[,]" (Compl. ¶ 113).

21.     In sum, Plaintiff alleges that between 2017 and his departure from the company in 2019, he "quarterback'd" at least twenty-four deals, with the value of the contracts being at least $15,117,250.10, which yields at least $604,690.00 in commissions calculated at a 4% rate. (Compl. ¶¶ 91–92.) Plaintiff additionally alleges that he assisted at least 20 contracts valued no less than $936,050.50, yielding him a right to collect at least $18,721.01 pursuant to a 2% commission rate. (Compl. ¶¶ 93–94.) In total, Plaintiff alleges that he is entitled to $623,411.01, of which no amount has been paid. (Compl. ¶¶ 95, 114.)

22.     Plaintiff seeks to hold each Defendant liable for this amount. He alleges that Lindberg owns, either directly or indirectly, each corporate Defendant, and that Eli Global owns ECL, which owns IMW, which owns iMedicware. (Compl. ¶¶ 21–23.) Plaintiff also alleges that Lindberg is the sole listed manager of more than one hundred entities registered in North Carolina, all of which use 2222 Sedwick Road, Durham, North Carolina as their principal mailing address, (Compl. ¶¶ 15–16), and that the emails Eye Care Leaders representatives used came from a variety of email addresses, including an Eli Global address, an email address from an entity unrelated to this dispute, and an Eye Care Leaders address, (Compl. ¶¶ 66, 75, 102). Plaintiff alleges that Lindberg controlled each corporate Defendant and none had a separate will at any relevant time. (*See, e.g.*, Compl. ¶ 24.) Specifically, Plaintiff alleges that "Defendants, all doing business as Eye Care Leaders and utilizing the same corporate

manager and director or indirect owner (Mr. Lindberg) and utilizing the same day-to-day management teams, are alter egos and mere instrumentalities of each other and of Mr. Lindberg." (Compl. ¶ 115.)

## III. PROCEDURAL BACKGROUND

23. Plaintiff filed his Complaint on May 15, 2020. (Compl., ECF No. 4.)

24. The case was designated as a mandatory complex business case on May 18, 2020, (Designation Order, ECF No. 1), and assigned to the undersigned the following day, (Assignment Order, ECF No. 2).

25. Defendants filed their Motion to Dismiss on July 17, 2020. (Mot. Dismiss, ECF No. 7.)

26. The Motion was fully briefed, the Court heard oral arguments, and the Motion is ripe for determination.

## IV. STANDARD OF REVIEW

27. When ruling on a Rule 12(b)(6) motion, a court inquires "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987) (citing *Stanback v. Stanback*, 297 N.C. 181, 185, 254 S.E.2d 611, 615 (1979)). A court must construe the allegations in the pleading "in the light most favorable to the non-moving party[,]" *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5, 802 S.E.2d 888, 891 (2017) (quoting *Kirby v. N.C. Dep't of Transp.*, 368 N.C. 847, 852, 786 S.E.2d 919, 923 (2016)), but is not required "to accept as true allegations that are merely

conclusory, unwarranted deductions of fact, or unreasonable inferences," *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005) (quoting *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002)).

28.     Dismissal of a claim pursuant to Rule 12(b)(6) is therefore only proper "(1) when the complaint on its face reveals that no law supports [the] claim; (2) when the complaint reveals on its face the absence of fact[s] sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the . . . claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985) (citing *Forbis v. Honeycutt*, 301 N.C. 699, 701, 273 S.E.2d 240, 241 (1981)); *see Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (stating that dismissal is not appropriate "unless it appears to a certainty that [the] plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim" (emphasis omitted)).

## V.     ANALYSIS

29.     The Court addresses each of Plaintiff's nine claims in turn.

### A.     **Breach of Contract**

30.     Plaintiff presents claims based on two contracts: the initial 2017 agreement made by Defendants in connection with the acquisition of iMedicware, and the 2018 Commission Plan restructuring his commissions. (*See* Pl.'s Br. Opp'n Mot. Dismiss 7 [hereinafter "Br. Opp'n"], ECF No. 13.) Plaintiff, however, refers to these contracts collectively as the "Agreement[.]" (Compl. ¶ 150.)

31.   Defendants argue that Plaintiff's own allegations defeat any finding that an enforceable contract was ever reached, relying first on the August 27, 2018 emails by which Plaintiff asked Gallup to "put in place something that outlines" their oral discussion and Gallup's forwarding email to Plaintiff's father stating that paying Plaintiff will "sink the year." (Br. Supp. Defs.' Mot. Dismiss Compl. 4–5 [hereinafter "Br. Supp"], ECF No. 8; *see* Aug. Email Chain.)  Additionally, Defendants argue that the emails Richards sent to Plaintiff describing the language he had "developed" with Gallup, (Oct. 16 Email II), and updating language as to what Plaintiff "will be" eligible for, (Oct. 19 Email), confirm that the parties were merely engaged in negotiations for a future agreement, (Br. Supp. 5). Plaintiff contends that an agreement had been reached and continuing negotiations were only as to the writing confirming the agreement.  (Br. Opp'n 7.)

32.   "The elements of breach of contract are (1) the existence of a valid contract and (2) breach of the terms of the contract." *RD&J Props. v. Lauralea-Dilton Enters., LLC*, 165 N.C. App. 737, 742, 600 S.E.2d 492, 497 (2004) (quoting *Long v. Long*, 160 N.C. App. 664, 668, 588 S.E.2d 1, 4 (2003)).  "To constitute a valid contract, the parties 'must assent to the same thing in the same sense, and their minds must meet as to all the terms.' " *Boyce v. McMahan*, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974) (quoting *Croom v. Goldsboro Lumber Co.*, 182 N.C. 217, 220, 108 S.E. 735, 737 (1921)).

33.   The Court concludes that Plaintiff's allegations might support a finding in favor of either party's position, but are adequate to state a claim for breach of

contract when accepted as true for purposes of the Motion to Dismiss. "If the minds of the parties meet upon a proposition, which is sufficiently definite to be enforced, the contract is complete, although it is in the contemplation of the parties that it shall be reduced to writing as a memorial or evidence of the contract[.]" *Elks v. N. State Ins. Co.*, 159 N.C. 619, 624, 75 S.E. 808, 810–11 (1912); *see also N.C. Nat'l Bank v. Wallens*, 26 N.C. App. 580, 583, 217 S.E.2d 12, 15 (1975) (explaining that "if the parties in the present case had manifested an intent not to become bound until the execution of a more formal agreement or document, then such an intent would be given effect").

34.     The Court does not believe Plaintiff has demonstrated a basis to find that Defendants have made a judicial admission of liability. Likewise, the Complaint does not require a necessary conclusion that negotiations for a written agreement negate the formation of a binding oral agreement. *See Kornegay v. Aspen Asset Grp., LLC*, 204 N.C. App. 213, 220–21, 693 S.E.2d 723, 730 (2010) (stating that there is no contract formation where "the parties are merely negotiating to see if they can agree upon terms, and that the writing is to be the contract" (quoting *Elks*, 159 N.C. at 624, 75 S.E. 808 at 811)).

35.     In sum, the Court concludes that Plaintiff's breach of contract claim survives the Motion to Dismiss.

B.     **Quantum Meruit/Unjust Enrichment**

36.     The quantum meruit claim is asserted in the alternative to Plaintiff's breach of contract claim. Defendants argue that the quantum meruit claim must fail

because Plaintiff's allegations demonstrate that Plaintiff was adequately compensated and Defendants were not unjustly enriched. (Br. Supp. 6–7.) Plaintiff counters that his salary compensation does not preclude a separate quantum meruit recovery for unpaid commissions. (Br. Opp'n 8–9.)

37. A prima facie claim for quantum meruit/unjust enrichment includes five elements: (1) "one party must confer a benefit upon the other party[;]" (2) "the benefit must not have been conferred officiously, that is it must not be conferred by an interference in the affairs of the other party in a manner that is not justified in the circumstances[;]" (3) "the benefit must not be gratuitous[;]" (4) "the benefit must be measurable[;]" and (5) "the defendant must have consciously accepted the benefit." *JPMorgan Chase Bank, Nat'l Ass'n v. Browning*, 230 N.C. App. 537, 541–42, 750 S.E.2d 555, 559 (2013) (emphasis omitted) (citations and internal quotation marks omitted). "Thus, in order to prevail on a claim of unjust enrichment, a plaintiff must show that 'property or benefits were conferred on a defendant under circumstances which give rise to a legal or equitable obligation on the part of the defendant to account for the benefits received.' " *Butler v. Butler*, 239 N.C. App. 1, 7, 768 S.E.2d 332, 336 (2015) (quoting *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 417, 537 S.E.2d 248, 266 (2000), *disc. review denied*, 353 N.C. 378, 547 S.E.2d 13 (2001)).

38. Again construing the allegations in Plaintiff's favor, the Complaint's allegations support a potential finding that if no final enforceable contract was reached, Defendants, or at least one of them, encouraged Plaintiff's continued efforts

to obtain customer contracts by indicating the promise of commissions to be paid and then accepting the benefit of those contracts. (*See, e.g.*, Compl. ¶¶ 39, 50, 52, 63–64, 74.)

39. The Court is not persuaded by Defendants' technical argument that Plaintiff did not specifically allege that his base compensation, standing alone, was unreasonably low and therefore unjust. (*See* Br. Supp. 7.) While "[i]t is a well established principle that an express contract precludes an implied contract with reference to the same matter[,]" *Vetco Concrete Co. v. Troy Lumber Co.*, 256 N.C. 709, 713, 124 S.E.2d 905, 908 (1962), the services Plaintiff provided with the expectation that he would be paid commission are in addition to, not in place of, the services he provided as a base employee, (*see, e.g.*, Compl. ¶¶ 32–33, 60–61, 106); *see also Horack v. S. Real Estate Co. of Charlotte, Inc.*, 150 N.C. App. 305, 311, 563 S.E.2d 47, 52 (2002) (quoting *Whitfield v. Gilchrist*, 348 N.C. 39, 42, 497 S.E.2d 412, 414 (1998)).

40. Accordingly, Plaintiffs' quantum meruit/unjust enrichment claim survives the Motion to Dismiss.

## C. **Account Stated**

41. Plaintiff contends that Defendants' communications are adequate to support a claim based on account stated. (Br. Opp'n 9–10.)

42. "An account stated is by nature a new contract to pay the amount due based on the acceptance of or failure to object to an account rendered." *Carroll v. McNeill Indus., Inc.*, 296 N.C. 205, 209, 250 S.E.2d 60, 62 (1978). There are four elements in an account stated claim: "(1) a calculation of the balance due; (2)

submission of a statement to [the party to be charged]; (3) acknowledgment of the correctness of that statement by [the party to be charged]; and (4) a promise, express or implied, by [the party to be charged] to pay the balance due." *Mast v. Lane*, 228 N.C. App. 294, 296–97, 745 S.E.2d 56, 58 (2013) (quoting *Carroll*, 296 N.C. at 209, 250 S.E.2d at 62). "[F]or an account stated to arise it is essential that there be 'an agreement between parties that an account rendered by one of them to the other is correct.'" *Mazda Motors of America, Inc. v. Southwestern Motors, Inc.*, 296 N.C. 357, 364, 250 S.E.2d 250, 255 (1979) (quoting *Mahaffey v. Sodero*, 38 N.C. App. 349, 351, 247 S.E. 2d 772, 774 (1978)).

43.     Plaintiff relies on (i) Richards' confirmation that Plaintiff was entitled "at a minimum" to $410,784.01, calculated as the difference between the total $604,690 of commissions Plaintiff included in his spreadsheet and the amount of $212,627.00 which Richards specifically disputed, (Compl. ¶¶ 96–98); (ii) Dua's having "conceded [that] Plaintiff was entitled to payment of at least $53,396.90[,]" (Compl. ¶ 106); and (iii) Gregg having orally indicated that Plaintiff was entitled to the full amount requested, (Compl. ¶¶ 110–12; *see* Br. Opp'n 10). As to Gregg's alleged statement, it is significant that he also advised Plaintiff that Eye Care Leaders had no intention of paying him those amounts. (Compl. ¶ 112).

44.     Generally, "when an account is . . . so rendered [and] there is no protest or objection to its correctness within a reasonable time, such acceptance or failure to so object creates a new contract to pay the amount due." *Little v. Shores*, 220 N.C. 429, 431, 17 S.E.2d 503, 504–05 (1941). However, Plaintiff's own allegations reflect

that at various times Eye Care Leaders representatives specifically disputed the amounts owed, and that Eye Care Leaders had no intent to pay the amount claimed. (*See* Compl. ¶¶ 98, 106, 112.)

45. The Court concludes that Plaintiff's allegations, even accepted as true, do not present a claim of account stated. Accordingly, the Motion to Dismiss Plaintiff's claim for account stated is granted.

### D. **Fraud**

46. Plaintiff seeks to support a claim that he was fraudulently induced to sell The Iron Trust's interest in iMedicware and to continue his employment based on promises to pay him future commissions, all the while Defendants had no intent to perform in accord with these promises. (Compl. ¶¶ 190–91.) Defendants contend that any subsequent dispute as to the amount of commissions does not support a claim for fraud, and further argue that any claim that colorably might be asserted by The Iron Works is a claim that Plaintiff cannot assert individually. (*See* Br. Supp. 10–12.)

47. A claim for actual fraud has five elements: "(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Terry v. Terry*, 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981) (quoting *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E. 2d 494, 500 (1974)). "As a general rule, a mere promissory representation will not be sufficient to support an action for fraud." *Leftwich v. Gaines*, 134 N.C. App. 502, 508, 521 S.E.2d 717, 723 (1999) (citation

omitted). However, a promissory representation may be actionable "when it is made with intent to deceive the promisee, and the promisor, at the time of making it, has no intent to comply." *Id.* (citation omitted). However, "[m]ere proof of nonperformance is not sufficient to establish the necessary fraudulent intent." *Williams v. Williams*, 220 N.C. 806, 811, 18 S.E.2d 364, 367 (1942).

48. In seeking to support his fraud claim, Plaintiff emphasizes Gregg's statement that Eye Care Leaders did not intend to pay Plaintiff the amount he requested in hopes that he would ultimately accept a lesser amount. (Compl. ¶ 112–13; *see* Br. Opp'n 14.) However, this statement came well into communications as to what had already become a disputed claim and do not support a finding that they induced Plaintiff's employment. Other than the general negotiations to continue Plaintiff's compensation arrangement after the iMedicware acquisition, Plaintiff has alleged no sufficient basis for a conclusion that the representations were illusory. Likewise, the Court concludes that Plaintiff's allegation that "Defendants have . . . repeatedly misrepresented the ownership status of iMedicware and Eye Care Leaders in an effort to confuse Plaintiff's attempt to collect the [c]ommissions[,]" (Compl. ¶ 198), is not adequate to support a claim that he was fraudulently induced to enter his employment with Eye Care Leaders or any constituent company.

49. As discussed below, to the extent Plaintiff grounds his fraud claim on representations arising after he contends a contract had been formed, Plaintiff is confronted with the economic loss rule.

50. The Court concludes that Plaintiff's fraud claim should be dismissed.

**E. Negligent Misrepresentation**

51. Plaintiff pleads, in the alternative to his claim for fraud, that Defendants negligently misrepresented "material[ ] facts in connection with the negotiation of the Commission Plan and Agreement and Plaintiff's employment with Eye Care Leaders," including representations made before and after contract formation. (Compl. ¶ 211.) Defendants argue that Plaintiff's claim rests only in contract, because there is no allegation that Defendants breached any duty owed Plaintiff outside of the alleged contractual relationship. (Br. Supp. 12–13.)

52. "The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988) (citations omitted). "[T]he economic loss rule, in its simplest form, holds that purely economic losses are not ordinarily recoverable under tort law." *Crescent Univ. CityVenture, LLC v. AP Atl., Inc.*, 2019 NCBC LEXIS 49, at *14 (N.C. Super. Ct. Aug. 14, 2019) (citation and internal quotation marks omitted). Consequently, "a tort action will not lie against a promisor 'for his simple failure to perform his contract, even though such failure was due to negligence or lack of skill.'" *Id.* at *16 (quoting *N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 294 N.C. 73, 83, 240 S.E.2d 345, 351 (1978), *rejected in part on other grounds*, *Trs. of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs., Inc.*, 313 N.C. 230, 328 S.E.2d 274 (1985)).

53. "To state a viable claim in tort for conduct that is also alleged to be a breach of contract, a plaintiff must allege a duty owed to him by the defendant separate and distinct from any duty owed under a contract." *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *89 (N.C. Super. Ct. Nov. 3, 2011) (citation and internal quotation marks omitted). "The independent tort must be identifiable and the tortious conduct must have an aggravating element such as fraud, malice, reckless indifference, oppression, insult, or willfulness." *Id.* (citation and internal quotation marks omitted).

54. Plaintiff invokes the holding of *City of High Point v. Suez Treatment Sols. Inc.*, 2020 U.S. Dist. LEXIS 47641, at *26 (M.D.N.C. Mar. 19, 2020), that when forming a contract, one contracting party owes the other "a separate and distinct duty not to provide false information to induce the execution of the contract[,]" (citation omitted); (Br. Opp'n 14). Plaintiff claims that he has alleged that Defendants deliberately schemed to commit fraud by inducing Plaintiff to enter into the agreement with them, giving rise to a distinct duty which, when breached, supports a claim of negligent misrepresentation not barred by the economic loss rule. (Br. Opp'n 14); *see CS Tech., Inc. v. Horizon River Techs., LLC*, 2020 U.S. Dist. LEXIS 140575, at *27 (W.D.N.C. Aug. 5, 2020) ("[T]he economic loss rule does not bar a claim that a party was fraudulently induced to enter a contract[.]").

55. The Court finds that the negligent misrepresentation claim essentially restates Plaintiff's fraud claim and fails for the same reason. His claim is that Defendants failed to perform as promised. His remedy lies in contract. *See Suez*

*Treatment Sols. Inc.*, 2020 U.S. Dist. LEXIS 47641, at *30 (limiting its negligent misrepresentation holding to representations made prior to contract formation, as post-contract formation, the plaintiff "had already been 'induced' into entering into the [c]ontract"); *cf. Ada Liss Group v. Sara Lee Corp.*, 2010 U.S. Dist. LEXIS 59691, at *31–35 (M.D.N.C. 2010) (noting that "[t]o the extent that Plaintiff's fraud and negligent misrepresentation claims simply mirror the claims for breach of contract, or are based on the same allegations of misconduct as the breaches, they cannot survive")

56. The Court concludes that the negligent misrepresentation claim should be dismissed.

**F.** **Conversion**

57. Plaintiff alleges that Defendants' failure to pay his commissions has deprived him of "the full exercise of his rights" to possess those commissions, and that a conversion claim arises against Defendants because of their unlawful possession of the monies to which Plaintiff is entitled. (Compl. ¶¶ 229, 235; Br. Opp'n 15–16). Defendants argue North Carolina does not recognize a cause of action for conversion in contractual employment claims for commissions. (Br. Supp. 13–15.)

58. Defendants are correct that North Carolina has not to date recognized a cause of action for conversion based on an employee's claim for unpaid commissions. *See Anderson v. Sara Lee Corp.*, 508 F.3d 181, 190 (4th Cir. 2007) ("[T]he Supreme Court of North Carolina has not recognized causes of action for conversion . . . in employer-employee disputes over unpaid wages . . . , and there is no basis for

concluding that it would do so if given the opportunity[.]"). Plaintiff is correct to a degree in asserting that ownership of money in certain circumstances can support a conversion claim. *See Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 528, 723 S.E.2d 744, 750 (2012) (stating that money can be the basis of a conversion claim when it can be "identified and described" (citation and internal quotation marks omitted)).

59. The Court concludes, however, that Plaintiff's claim to commissions is based on an unfulfilled contract right, which is an intangible interest not subject to a conversion claim. *See Spinks v. Taylor*, 303 N.C. 256, 264, 278 S.E.2d 501, 506 (1981) ("In this state, conversion is defined as 'an authorized assumption and exercise of the right of ownership over *goods or personal chattels* belonging to another, to the alteration of their condition or the exclusion of an owner's rights.'" (emphasis added) (quoting *Peed v. Burleson, Inc.*, 244 N.C. 437, 439, 94 S.E. 2d 351, 353 (1956)); *Horne Heating & Air Conditioning Co. v. Horne*, 2017 NCBC LEXIS 96, at *9 (N.C. Super. Ct. Oct. 11, 2017) (stating that contract rights are "an intangible interest under North Carolina law").

60. Accordingly, Plaintiff's conversion claim should be dismissed.

**G.    Unfair or Deceptive Trade Practices**

61. Once again, the Court is presented with a claim that an employment dispute arises to a claim for unfair or deceptive trade practices within the scope of Chapter 75 ("UTDP"). (Compl. ¶¶ 255–56); N.C.G.S. § 75-1.1. And, once again, the Court concludes that the claim fails.

62.     "The basic elements of a UDTP claim include that '(1) defendants committed an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) that plaintiff was injured thereby.' " *Gupta v. Eli Global, LLC*, 2019 NCBC LEXIS 40, *at 21 (N.C. Super. Ct. June 19, 2019) (quoting *Strickland v. Lawrence*, 176 N.C. App. 656, 665, 627 S.E.2d 301, 307 (2006)).   "The 'in or affecting commerce' element restricts the otherwise broad scope of the claim, so that the statute does not address all wrongs arising in a business setting, including most employer-employee disputes." *Id.*  Nevertheless, "the mere existence of an employer-employee relationship does not in and of itself serve to exclude a party from pursuing an unfair trade or practice claim." *Durling v. King*, 146 N.C. App. 483, 488, 554 S.E.2d 1, 4 (2001) (quoting *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001)); *see Sara Lee Corp. v. Carter*, 351 N.C. 27, 34, 519 S.E.2d 308, 312 (1999); *Gupta*, 2019 NCBC LEXIS 40, *at 21.

63.     Plaintiff attempts to bring his claim within the limited holding of *Sara Lee* by asserting that Defendants' failure to pay commissions affects the market by confusing the marketplace and preventing "potential competition[,]" and Plaintiff's ability to "market his own services separately[.]"  (Compl. ¶ 258.)  The Court finds that these allegations are not adequate to take the claim beyond the context of the employment relationship and to demonstrate a claim arising "in commerce."  *See Esposito v. Talbert & Bright, Inc.*, 181 N.C. App. 742, 746, 641 S.E.2d 695, 698 (2007) (holding that even assuming the defendants' acts were unfair or deceptive harming the plaintiff, "plaintiff has forecast no evidence that defendants' statements and

actions had any impact beyond his employment relationship"). Rather, Plaintiff's allegations "arise[ ] out of [his] employment and plainly involve[ ] internal business disputes rather than interactions with businesses or consumers." *Kingsdown, Inc. v. Hinshaw*, 2015 NCBC LEXIS 30, at *28 (N.C. Super. Ct. Mar. 25, 2015).[2]

64. Accordingly, Plaintiff's UDTP claim should be dismissed.

## H.     Tortious Interference with Contract

65. Plaintiff alleges that all Defendants except iMedicware ("non-iMedicware Defendants") intentionally interfered with Plaintiff's employment contracts with iMedicware by "directing or otherwise causing and inducing iMedicware not to pay" Plaintiff.[3]  (Compl. ¶ 243.)

66. To state a claim for tortious interference with contract, Plaintiff must allege:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

---

[2] Plaintiff argues that Defendants fraudulently induced his employment, bringing their actions within the scope of a UDTP claim. (Br. Opp'n 19 (citing *Fusco v. NorthPoint ERM, LLC*, 2016 U.S. Dist. LEXIS 4254 (W.D.N.C. Jan. 13, 2016) (allowing a UDTP claim when the "gravamen" of the plaintiffs' complaints involved statements prior to their employment and designed to induce their employment)). This case is factually distinguishable, as Plaintiff was already employed with iMedicware and alleges that Defendants' fraud induced his *continued* employment, and therefore does not control the Court's analysis here.

[3] This count would seem to be limited to commissions Plaintiff contends he had earned before IMW's acquisition of iMedicware, as he has otherwise claimed that after the acquisition he entered a contract with "Eye Care Leaders," not iMedicware. (*See, e.g.*, Compl. ¶ 60 ("[R]epresentatives of Eye Care Leaders agreed to compensate Plaintiff[.]").)

*United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988). "Interference is without justification if a defendant's motive is not reasonably related to the protection of a legitimate business interest." *Sellers v. Morton*, 191 N.C. App. 75, 82, 661 S.E.2d 915, 921 (2008) (citation and internal quotation marks omitted). Those with a legitimate business interest "enjoy qualified immunity from liability for inducing their corporation or other entity to breach its contract with an employee." *Barker v. Kimberly-Clark Corp.*, 136 N.C. App. 455, 462, 524 S.E.2d 821, 826 (2000). However, that privilege "is lost if exercised for motives other than reasonable, good faith attempts to protect the [defendant's] interests in the contract interfered with." *Lenzer v. Flaherty*, 106 N.C. App. 496, 513, 418 S.E.2d 276, 286, *cert. denied*, 332 N.C. 345, 421 S.E.2d 348 (1992).

67.     Plaintiff alleges that Defendants own iMedicware, (Compl. ¶¶ 22–23), and that Defendants "are all members of a consortium of entities . . . and operat[e] as a single public-facing entity under [one] name[,]" (Compl. ¶ 11).  Thus, even under Plaintiffs' allegations, Defendants at least at some point had a legitimate business interest in protecting iMedicware against any liability it contests but may have assumed as a part of IMW's acquisition and the continuation of iMedicware's business operations.

68.     Plaintiff alleges, however, that any justification or legitimate business interest was lost when Defendants acted with malice when refusing to pay monies they acknowledged were due in order to "string Plaintiff along" until he accepted a lessor offer.  (Compl. ¶¶ 112–13, 244.)  The Court concludes that this allegation is a

narrow ground on which to potentially ground liability based on acts which cannot be justified as a "reasonable, good faith attempt" to protect Defendants' legitimate interests. *See Lenzer*, 106 N.C. App. at 513, 418 S.E.2d at 286; *see also You v. Roe*, 97 N.C. App. 1, 9–10, 387 S.E.2d 188, 192 (1990) ("The action must be taken with the design of injuring one of the parties to the contract or of gaining some advantage at the expense of a party.").

69.     The Court concludes that Plaintiff's tortious interference claim survives the Motion to Dismiss subject to later review upon a motion for summary judgment based on a more developed record.

### I.     Attorneys' Fees

70.     Although not an independent cause of action, Plaintiff's ninth claim is for attorneys' fees pursuant to N.C.G.S. §§ 6-21, 95-25.22(d), and 75-16.1.  (Compl. ¶¶ 266–68.)  Plaintiff has now agreed that he is not entitled to attorneys' fees under sections 6-21 or 95-25.22(d), but contends that he is entitled to attorneys' fees under section 75-16.1.  (Br. Opp'n 23 n.6.)

71.     The Court, having concluded that the UDTP claim should be dismissed, further concludes that the Plaintiff's claim for attorneys' fees should be dismissed.

### J.     Piercing the Veil

72.     Plaintiff requests that the Court pierce the veil of iMedicware so that each Defendant, including Lindberg, may be held jointly and severally liable for his unpaid commissions.  (Compl. Prayer Relief ¶ 1.)

73.     While a request to pierce the corporate veil is well-recognized in North Carolina law, it is an extraordinary remedy. *Green v. Freeman*, 367 N.C. 136, 145, 749 S.E.2d 262, 270 (2013) ("Disregarding the corporate form is not to be done lightly.")); *see also State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 438–39, 666 S.E.2d 107, 112 (2008) ("[W]hile [a] corporation's separate and independent existence is not to be disregarded lightly, it may be theoretically permissible to look behind the corporate form." (citation and internal quotation marks omitted)).

74.     "It is well recognized that courts will disregard the corporate form or 'pierce the corporate veil,' and extend liability for corporate obligations beyond the confines of a corporation's separate entity, whenever necessary to prevent fraud or to achieve equity." *Glenn v. Wagner*, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985). North Carolina has adopted the instrumentality rule, under which "a corporation which exercises actual control over another, operating the latter as a mere instrumentality or tool, is liable for the torts of the corporation thus controlled." *B-W Acceptance Corp. v. Spencer*, 268 N.C. 1, 8, 149 S.E. 2d 570, 575 (1966) (citation omitted).

75.     There are three elements "which support an attack on separate corporate entit[ies]" under this rule: (1) "[c]ontrol, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own"; (2) "[s]uch

control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights"; and (3) "[t]he aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." *Glenn*, 313 N.C. at 454–55, 329 S.E.2d at 330 (quoting *B-W Acceptance Corp.*, 268 N.C. at 9, 149 S.E. 2d at 576).

76.     Factors to be considered include: (1) inadequate capitalization, (2) non-compliance with corporate formalities, (3) complete domination and control of the corporation such that it has no independent identity, and (4) excessive fragmentation of a single enterprise into separate corporations. *Id.* at 445, 329 S.E.2d at 330–31; *see generally* Robinson, North Carolina Corporation Law, §§ 2-10[2], 2-27–2-36 (7th ed. 2019).

77.     Plaintiff's allegations are more easily characterized as legal conclusions than they are of distinct specific facts justifying the extraordinary remedy of piercing the corporate veil. At the same time, it is clear that multiple corporate entities appear to have conduct activities under the Eye Care Leaders umbrella.

78.     Read broadly, Plaintiff's allegations include statements that (i) Eli Global, controlled by Lindberg, is the direct or indirect parent owner of the "Subsidiary Defendants[,]" owning ECL, which owns IMW, which in turn owns iMedicware, (Compl. ¶¶ 13, 21–23); (ii) Lindberg is the sole listed manager of more than one hundred entities registered in North Carolina using the address 2222 Sedwick Road, Durham, North Carolina, the address each corporate Defendant has

listed as its principal mailing address, (Compl. ¶¶ 15–16); (iii) Nordberg, general counsel for Eli Global and acting as a representative of Eye Care Leaders, approached iMedicware shareholders to discuss its sale, (Compl. ¶ 35); (iv) IMW, not Eli Global, purchased the controlling share of iMedicware, (Compl. ¶¶ 40, 44); (v) the corporate Defendants operated as Eye Care Leaders with a single set of officers and executives, including Gallup (CEO of Eye Care Leaders) and Richards (CLO of "Eli Global / Eye Care Leaders[,]" and later CEO of Eli Global), (Compl. ¶¶ 56, 62); (vi) responses to Plaintiff's requests for payment were sent from a number of various email addresses, including an Eli Global address, (Compl. ¶ 66), an email address from an entity unrelated to this dispute, (Compl. ¶ 75), and an Eye Care Leaders address, (Compl. ¶ 102); and (vii) companies doing business under the Eli Global "umbrella" have a history of using their corporate structure to avoid paying employees (Compl. ¶¶ 134–39).

79. The Court is persuaded that it should defer its further consideration of whether Plaintiff is entitled to pursue liability beyond the specific company with which he proves he has an enforceable employment agreement. In general, piercing the corporate veil is a matter of remedy, not a separate specific cause of action. *See Green*, 367 N.C. at 146, 749 S.E.2d at 271 ("The doctrine of piercing the corporate veil is not a theory of liability."); *see also W & W Partners, Inc. v. Ferrell Land Co., LLC*, 2018 NCBC LEXIS 52, at *22 (2018) ("[P]iercing the corporate veil is an ancillary equitable remedy and not an independent cause of action.").

80. The Court determines that it will defer its consideration of whether Plaintiff is entitled to the equitable remedy of veil piercing until the issue of liability is resolved. Ultimately, to pursue an effort to tax liability to all Defendants, assuming he succeeds on any claim for liability, Plaintiff will be required to assert and prove much more specific acts in support of his contention that any Defendant disregarded corporate formalities and exercised complete domination and control over another.

## VI. CONCLUSION

81. For the reasons stated above, Defendants' Motion is DENIED in part and GRANTED in part as follows:

a. Defendants' Motion to Dismiss is DENIED as to Plaintiff's claims for breach of contract, quantum meruit/unjust enrichment, and tortious interference with contract;

b. Defendants' Motion to Dismiss is GRANTED as to Plaintiff's claims for account stated, fraud, negligent misrepresentation, conversion, UDTP, and attorneys' fees; and

c. The Court defers its further consideration of Plaintiff's claim that he is entitled to pierce any Defendant's corporate veil in order to enforce liability against others.

IT IS SO ORDERED, this the 18th day of December, 2020.

/s/ James L. Gale
James L. Gale
Senior Business Court Judge